UNITED STATES, Appellee

v.

Carlos M. NORRIS, Machinist's Mate Third Class
U.S. Navy, Appellant

No. 00-0302

Crim. App. No. 98-1311

United States Court of Appeals for the Armed Forces

Argued November 9, 2000

Decided July 2, 2001

EFFRON, J., delivered the opinion of the Court, in which
CRAWFORD, C.J., and GIERKE and BAKER, JJ., joined.  SULLIVAN,
J., filed an opinion concurring in the result.


Counsel


For Appellant:  Lieutenant Glenn Gerding, JAGC, USNR (argued); Lieutenant
    Dale O. Harris, JAGC, USNR.



For Appellee:  Major Robert M. Fuhrer, USMC (argued); Lieutenant Colonel Marc
    W. Fisher, Jr., USMC, Lieutenant Commander Philip L. Sundel, JAGC, USNR,
    and Major Kathleen P. Kelly, USMC (on brief); Colonel Kevin M.
    Sandkuhler, USMC, and Major Michael D. Tencate, USMC.



Military Judge:  D. Michael Hinkley



THIS OPINION IS SUBJECT TO EDITORIAL CORRECTION BEFORE PUBLICATION.

Judge EFFRON delivered the opinion of the Court.

A general court-martial composed of a military judge sitting alone convicted appellant, contrary to his pleas, of rape of a female under 16 years of age; 8 specifications of committing indecent acts on a female under 16 years of age; and communicating indecent language to a child under 16 years of age, in violation of Articles 120 and 134, Uniform Code of Military Justice, 10 USC §§ 920 and 934, respectively. He was sentenced to a dishonorable discharge, confinement for 5 years, total forfeitures, and reduction to pay grade E-1. The convening authority approved these results, and the Court of Criminal Appeals affirmed in an unpublished opinion.

On appellant's petition, we granted review of the following issues:

> I. WHETHER THE MILITARY JUDGE ERRED BY ADMITTING IMPROPER OPINION TESTIMONY REGARDING A DIAGNOSIS OF POST-TRAUMATIC STRESS DISORDER.
>
> II. WHETHER THE MILITARY JUDGE ERRED BY ADMITTING STATEMENTS MADE BY APPELLANT TO THE FATHER OF THE ALLEGED VICTIM, WHERE THOSE STATEMENTS WERE OBTAINED IN VIOLATION OF ARTICLE 31(b), UCMJ.

For the reasons set forth below, we affirm.

## I.  BACKGROUND

Appellant and Machinist's Mate Chief (MMC) J met in the spring of 1995 when both were assigned to the USS INDEPENDENCE. They both attended the same church.  At the church, MMC J introduced appellant to his family, including his oldest daughter, who was the victim in this case.

The connection between appellant and MMC J's  family developed over time into a very close relationship.  Appellant visited their quarters several times a week, attended church with them, frequently ate dinner with the family, and several times a month spent the night at their house.  Appellant called MMC J and his wife "Dad" and "Mom" and called their children "brother" and "sisters."

The incidents of which appellant was convicted began sometime shortly after Christmas 1996, just before or just after the victim's fourteenth birthday on January 3, 1997.  In August 1997, MMC J and his wife learned there was a relationship between appellant and their daughter when Mrs. J found a letter their daughter had written to appellant.  Their daughter initially minimized the matter when they asked her what the letter meant.  Subsequent conversations between MMC J and appellant, and between the parents and their daughter, indicated that appellant sexually abused the victim, which ultimately led to the court-martial.

## II.  EXPERT OPINION TESTIMONY
## REGARDING A DIAGNOSIS OF POST-TRAUMATIC STRESS DISORDER

### A. Litigation at Trial Concerning the Qualifications of the Expert Witness

At trial, the prosecution called as a witness Ms. Trent, a civilian employee of the Clinical Division of the Family Service Center, for the purpose of providing expert testimony as to whether the victim was suffering from post-traumatic stress disorder (PTSD).  As part of the foundation for her opinion, she testified that she had provided therapy for the victim following the charged incidents at the request of her family.  She testified that she held a master's degree in counseling psychology, and a license in professional counseling and one in marriage and family therapy.  With respect to the nature of the services provided to sexual assault victims, she testified that the Family Service Center would

> make sure there is some sort of social, emotional support in place.  The next thing that we would do is try to -- we try to triage the level of trauma that the person is currently experiencing, the level of distress.  And we would move forward into that and look for ways to help alleviate the distress.

Following her initial testimony, defense counsel objected on the ground that Ms. Trent lacked the qualifications to render an opinion as to whether the victim suffered from PTSD.  Defense counsel acknowledged that the witness had extensive training and

4

experience working with sexual assault victims and their families, and that "many of these people maybe suffer from post-traumatic stress disorder." He contended, however, that the prosecution had not demonstrated Ms. Trent's "qualifications as a clinical psychologist or a person able to render that kind of opinion . . . giving this type of testimony as to an opinion of diagnosis."

In response to defense counsel's objection, the military judge told trial counsel "to flesh out the experience that this witness purportedly has concerning post-traumatic stress disorder." The military judge added that if the prosecution was relying on her experience to qualify her as an expert with respect to the opinion in question, "let's put it [the experience] on the record and go from there."

Ms. Trent then testified that she had been "trained in diagnosis" and had extensive experience under "the clinical supervision" of several psychologists and psychiatrists. As an example, she stated that, while working under the supervision of two psychiatrists in the adolescent unit of a Texas hospital, she worked as part of

> a team, which meant that I did the social
> history; I did the basic evaluation of the
> social structure, the strata that the client
> came in, the problems that the client was
> having and reported back to the
> psychiatrists, the psychologists, the treat
> team, and said to them what I thought the

> diagnosis was. And they would either concur
> or they would ask for more information and
> choose another diagnosis, but I found that
> to be the most useful working training.

She indicated that she also received training at the Giaretto

Institute in San Jose, California, in diagnosing and treating

victims of familial incest under the supervision of

psychiatrists and psychologists, which taught her to diagnose

PTSD. Since 1988, she had worked with over a thousand victims

of sexual assault. When working in circumstances in which she

was called upon to make a diagnosis, she found PTSD in over a

hundred of these cases. She added that she had worked "with

Illiano Gill, who is one of the highly recognized folks who work

with post-traumatic stress disorder, that the supervision and

the work that I did with her was very useful, very helpful. It

taught me how to diagnose."

Following this testimony, the military judge concluded that

"the foundation has been laid concerning her expertise in the

area of post-traumatic stress disorder." He overruled the

defense objection and permitted Ms. Trent to offer an expert

opinion as to whether the victim suffered from PTSD.

Ms. Trent testified that she had seen the victim for seven

one-hour sessions "of assessment and intervention for an

assault." With respect to her approach to making a diagnosis,

she said:

6

>           Well, initially what you're doing . . . is
>           you're gathering information and -- about
>           their ability to cope, about the
>           individual's ability to cope.  And she was
>           reporting sleep disturbance, eating
>           disturbance.  She had fear of the room that
>           she had been assaulted in, her bedroom.  She
>           was experiencing difficult[y] concentrating
>           in school.  She had a great deal of fear and
>           anxiety regarding what was going to happen
>           next.  She was experiencing a difficult time
>           communicating with her mother, communicating
>           with her father.  She was very -- she was
>           experiencing a great deal of anxiety when we
>           first met.  And I was assessing her for how
>           well she was able to cope.

She then described PTSD, the characteristics of a person suffering from that disorder, her diagnosis of the victim, and the specific symptoms that led to her conclusion that the victim in this case suffered from PTSD.  Ms. Trent also noted that the victim had made "great improvement" under therapy.

Under cross-examination, Ms. Trent testified that she had inquired into and ruled out any prior sexual abuse or victimization.  She acknowledged that she had not consulted the victim's medical records and that she was not aware that the victim had been treated with antidepressants prior to knowing appellant.  Also, she did not know that the victim had suffered from bedwetting at age 13.  She added that when a victim came to her for help in terms of "support during the trauma and the ability skills to resolve the trauma," she accepted at "face

value" what the victim and the victim's family told her about the history.

In an effort to undermine the credibility of Ms. Trent's diagnosis, the defense offered the testimony of a licensed clinical psychologist in the Medical Service Corps. The witness, who questioned various aspects of Ms. Trent's diagnosis, indicated that the set of factors customarily relied upon for diagnosis in the mental health discipline was broader than the factors relied upon by Ms. Trent.

We note that the defense objection to admissibility of the opinion testimony focused exclusively on Ms. Trent's qualifications. Although the defense later introduced evidence on the merits concerning the credibility of Ms. Trent's diagnostic opinion, the defense did not make an evidentiary objection to the contents of her testimony.

## B. Discussion

In Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), the Supreme Court held that admission of scientific evidence depends on consideration of many factors that go to relevance and reliability of the evidence. Subsequently, in Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999), the Court held that Daubert applies not only to expert testimony based upon "scientific" knowledge, but also to "technical" and "other

specialized" knowledge covered by Fed. R. Evid. 702. Id. at 141; see Mil. R. Evid. 702, Manual for Courts-Martial, United States (2000 ed.). The Court added that the trial judge's "gatekeeping obligation" under these decisions is to "ensure that any and all [expert] testimony . . . is not only relevant, but reliable." 526 U.S. at 147 (internal quotation marks omitted). The rules of evidence provide expert witnesses with testimonial latitude broader than other witnesses on the theory "that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." Id. at 148 (internal quotation marks omitted). In some cases, the reliability determination focuses on the expert's qualifications to offer the testimony or render the opinion in question. See id. at 149, 153. In others, it might implicate the factual basis or data that gave rise to the opinion. See id. Daubert and Kumho Tire were aimed at ensuring the overall reliability of the evidence, including any information used to form the basis for an opinion.

On appeal, appellant challenges the qualifications of Ms. Trent to render the expert opinion and the basis for the particular opinion she offered concerning the diagnosis of PTSD. Appellant does not challenge whether PTSD diagnosis is an appropriate subject for expert testimony under Mil. R. Evid. 702 or whether a PTSD diagnosis was relevant in the present case,

see Mil. R. Evid. 401 and 402.  As well, appellant does not dispute the reliability of such evidence, in the sense of the methodology or concept underlying diagnosing PTSD, or its probative value.  See Daubert and United States v. Gipson, 24 MJ 246 (CMA 1987).

The standard of our review of the military judge's ruling admitting the testimony is abuse of discretion.  General Electric Co. v. Joiner, 522 U.S. 136, 143 (1997); United States v. Houser, 36 MJ 392, 397 (CMA 1993).

Ms. Trent's occupation, for which she was trained and in which she was experienced, was counseling and treating victims of sexual abuse.  Ms. Trent was sought out by the victim's family for the purpose of providing counseling and therapy to the victim in helping to cope with her relationship with appellant.  In the course of providing such therapeutic assistance to the client, she was required to use her training and experience to reach certain conclusions about the client's ailments upon reasonable investigation.  Ms. Trent testified that after assuring that there was an adequate support system in place for a victim walking into her office, her next step was to "triage the level of trauma that the person is currently experiencing . . . and look for ways to help alleviate the distress."  The record of trial does not demonstrate that it was either inappropriate or unusual for a sexual abuse counselor

10

such as Ms. Trent to reach a working diagnosis for purposes of proceeding with her treatment of a client.

In short, Ms. Trent testified as a person with substantial expertise in providing counseling therapy to sexual abuse victims. At the request of MMC J and his wife, she had done so for their daughter, who had improved as a result of that treatment. As a necessary predicate to providing such service, Ms. Trent followed the standard procedure when treating a new client -- she reached a working diagnosis as to the victim's mental health condition. The military judge did not abuse his discretion in ruling that Ms. Trent was qualified as an expert with respect to the diagnostic opinion she formulated in the course of her providing the victim with the therapy that her family had requested. We need not decide whether her training or experience would have been sufficient under Daubert and Kumho Tire to provide an expert opinion with respect to a person that she did not evaluate in the course of such treatment.

The other aspect of appellant's argument on appeal concerns the adequacy of the foundation upon which Ms. Trent reached her diagnosis. As noted earlier, appellant did not contest admissibility of Ms. Trent's opinion at trial on this basis. See Mil. R. Evid. 703 (Bases of opinion testimony by experts). Instead, the defense limited its effort in this regard to the use of cross-examination and direct testimony on the merits

offered to question the credibility of her opinion and to reduce the persuasive weight that the factfinders would give to it. Even in so doing, however, the defense raised no specific questions that would lead us to conclude that it was inappropriate for a witness within the scope of Ms. Trent's expertise to reasonably rely upon the factors she considered in reaching her working diagnosis. See Id. On this record, there is no basis for finding error in this regard, much less plain error.


ISSUE II. APPELLANT'S ADMISSIONS


A. The Motion to Suppress Appellant's Admissions

The victim's father, MMC J, an E-7, was superior in grade to appellant, an E-4. Although they both were assigned to the engineering department of the same ship, they worked in different divisions and were not in the same chain of command.

As noted in section I of this opinion, MMC J's wife found a letter that their daughter -- the victim -- wrote to appellant. In that letter, the daughter told appellant: "I have to tell you something. I have to tell mom & dad. I can't lie or keep this in anymore. . . ." MMC J's wife discussed the letter with their daughter, and they asked their daughter what it meant. She crumbled up the letter and told them nothing had happened.

MMC J's initial reaction was to have a personal conversation with appellant rather than report the matter to law enforcement or disciplinary authorities. MMC J approached appellant 3 or 4 times over the next 8 days and asked appellant to talk to him, but appellant repeatedly declined because he was busy preparing to detach from the ship and separate from the Navy. Eventually, MMC J mentioned to appellant's immediate supervisor, an E-5, that he "needed to talk" to appellant. Subsequently, appellant let MMC J know that he would come to see him the next morning.

The following day, the two men met as planned in MMC J's office on board the ship at about 11:00 a.m., when both men were on duty and in uniform. They talked about several unrelated matters, including appellant's pending transition to civilian life and their church. Ultimately, MMC J told appellant about the letter from their daughter and asked him specific and repeated questions about the relationship. After initially providing "evasive" responses, appellant made several incriminating admissions. Appellant stated that he had kissed MMC J's daughter and that he had performed oral sex on her. He assured MMC J, however, that the girl "was still a virgin."

The conversation lasted approximately 2 hours, during which the door was closed but not locked, and several other people came and went freely. Neither man addressed the other by rank.

As the lunch period drew to a close, the conversation ended so that each could return to work.  They walked out of the office together.  Appellant offered to call MMC J later that evening to see if MMC J's wife "wanted to talk to him about th[e] situation."  MMC J did not provide rights' warnings under Article 31(b), UCMJ, 10 USC § 831(b), to appellant during their conversation.

That evening, appellant called Mrs. J, but she declined to talk to him.  MMC J and his wife told their daughter what appellant had told them about the relationship.  She broke down crying and provided further details.  In the course of doing so, she stated that appellant had raped her.  The following evening, MMC J brought this information to the attention of law enforcement authorities.

At trial, appellant made a timely motion to suppress his admissions to MMC J and any derivative evidence.  In support of the motion, appellant testified that he met with MMC J because his own supervisor had informed him that MMC J wanted to talk. He stated that in spite of their friendship, he considered his conversation to be with "a chief" petty officer, not a friend. He characterized the conversation as more of a "counseling session" than "a casual conversation," and indicated that he did not "really" feel free to leave or to end the conversation.

In his findings of fact, the military judge described the foregoing events and added the following:

> [MMC J's] questions were motivated by a personal concern to get to the bottom of the cryptic note . . . that his daughter, when confronted, had vaguely explained to him. In the words of [MMC J], his questions of the accused were personal questions that the answers to which, quote, any father would want to know, end quote;
>
> that at the time . . . [MMC J] was the father of [the victim] and was a father figure to the accused at the same time;
>
> that while [MMC J] had a hunch that something was not right based upon his review of [the letter], he wanted to get the accused's input to find out what had happened to cause his daughter to write the note;
>
> that at the time of the questions . . . [MMC J] did not suspect the accused of any offense and never ordered the accused to talk to him;
>
> that [MMC J] at the time had no idea of the details behind the note and was talking to the accused as a friend;
>
> that [MMC J] wanted the accused's side of the story concerning the references that [his daughter] made to the accused having kissed her and made passes at her;
>
>            *    *    *
>
> that [MMC J] had no intent to report the details of his conversation with the accused to Security . . . when he was asking these questions of the accused during their conversation;
>
>            *    *    *

That the accused asked [MMC J] if [MMC
J]wanted the accused to leave the office,
and that [MMC J]replied that it was up to
the accused to make that decision.  After
this exchange, the accused stayed and
continued the conversation;

That [MMC J]asked the questions of the
accused because he wanted to know personally
what had happened between his daughter and
the sailor who called him "Dad"; . . . .

Based upon these essential findings of fact, the military
judge ruled that MMC J was acting in a personal capacity during
his conversation with appellant, rather than in an official
capacity.  Under those circumstances, he ruled that there was no
violation of Article 31(b), citing our opinion in United States
v. Duga, 10 MJ 206 (CMA 1981), discussed infra at (17).  He
emphasized the following factors in support of his conclusion:
(1) the "close personal relationship" between the two men
included frequent conversations on serious subjects; (2) the
room door was not locked and appellant "could have left at any
time"; (3) after appellant asked MMC J whether MMC J "wanted him
to leave" and after MMC J replied that it was up to appellant,
appellant chose to remain and continue the conversation; (4)
appellant offered to contact MMC J's wife later to see if she
wanted to discuss the matter, and he in fact attempted to do so;
and (5) the 2-hour conversation was private, in an open-bay type

16

of office, in which "rank was not used" and which included conversation along several different general-subject lines.

## B.  Discussion

Article 31(b) provides that "[n]o person subject to this chapter may interrogate, or request any statement from, an accused or a person suspected of an offense without first" warning that person of his right to silence.  Early in this Court's history, we concluded that the purpose and legislative history of Article 31(b) demonstrated that Congress did not intend that provision to apply to every conversation between members of the armed forces regardless of the circumstances. United States v. Gibson, 3 USCMA 746, 752, 14 CMR 164, 170 (1954).  In Duga, supra at 210, we held that "the Article applies only to situations in which, because of military rank, duty, or other similar relationship, there might be subtle pressure on a suspect to respond to an inquiry."  We offered this guidance for assessing application of Article 31(b):

> [I]n each case it is necessary to determine
> whether (1) a questioner subject to the Code
> was acting in an official capacity in his
> inquiry or only had a personal motivation;
> and (2) whether the person questioned
> perceived that the inquiry involved more
> than a casual conversation.  United States
> v. Gibson, supra.  Unless both prerequisites
> are met, Article 31(b) does not apply.

(Footnote omitted.)

In our consideration of a military judge's ruling on a motion to suppress under Article 31(b), we apply a clearly-erroneous standard of review to findings of fact and a de novo standard to conclusions of law. United States v. Moses, 45 MJ 132, 135 (1996); United States v. Ayala, 43 MJ 296, 298 (1995). In the present case, the military judge's findings of fact are well within the range of the evidence permitted under the clearly-erroneous standard. Based on those findings and the rationale articulated by the military judge, we agree with the military judge that MMC J was acting in a personal rather than an official capacity under the first prong of Duga.

The findings of fact reflect a conversation in which MMC J's purpose was to understand and clarify the content of a letter written by his daughter to a man who had become such a close personal friend that he was treated like a member of his family. Although MMC J had a hunch that something more was involved than what his daughter had told him, he did not seek out appellant with a view towards elevating the matter to a criminal investigation and prosecution. The military judge's findings of fact indicate that until the point at which MMC J's daughter accused appellant of rape -- which was after MMC J's conversation with appellant -- MMC J considered the situation to be a family matter. It was only after the accusation of rape that MMC J treated it as a criminal matter. Although appellant

18

testified that he viewed his conversation as one with a chief petty officer, not a friend, and that he did not feel free to leave, the findings of fact by the military judge, supported by the evidence, are to the contrary.

Under these circumstances, the military judge was correct in ruling that Article 31(b) was not violated by MMC J's unwarned conversation with appellant. United States v. Duga, supra.  Consequently, evidence from that conversation was admissible.


CONCLUSION

The decision of the United States Navy-Marine Corps Court of Criminal Appeals is affirmed.

United States v. Norris, 00-0302/NA


SULLIVAN, Judge (concurring in the result):

I agree with the majority that the military judge did not abuse his discretion in admitting the challenged testimony of Ms. Trant. See United States v. Dollente, 45 MJ 234, 238 (1996); see also United States v. Raya, 45 MJ 251, 252-53 (1996). Its "substantial expertise" standard (11 Maj. Op.), however, is somewhat more demanding and considerably less precise than our traditional view that an expert be shown to have "training and experience beyond the ken of the average court member." United States v. Harris, 46 MJ 221, 224 (1997) (internal quotation marks omitted). I am not persuaded that Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) and its progeny require a wholesale reconsideration of our case law on this question. See Kumho Tire Co., Ltd. V. Carmichael, 526 U.S. 137, 153-55 (1999) (distinguishing an expert's qualifications from his methodology).


The second issue in this case I would resolve on the basis of this Court's decision in United States v. Loukas, 29 MJ 385, 387 (CMA 1990). I think reasonable men might differ in this case whether this was one of those "situations in which, because of military rank, duty, or other similar relationship, there might be subtle pressure on a suspect to respond to an inquiry." See United States v. Duga, 10 MJ 206, 210 (CMA 1981). However,

clearly this was not an official law-enforcement or disciplinary questioning.  United States v. Loukas, supra at 387.  That is enough to take it out of the ambit of Article 31(b).