UNITED STATES, Appellee,

v.

Specialist Jacqueline BILLINGS, United States Army, Appellant.

ARMY 9900122.

U.S. Army Court of Criminal Appeals.

13 June 2003.

For Appellant: Captain Mary E. Card, JA (argued); Lieutenant Colonel E. Allen Chandler, Jr., JA; Major Imogene M. Jamison,

JA; Captain Kevin J. Mikolashek, JA (on brief); Colonel Robert D. Teetsel, JA; Captain Mary E. Card, JA.

For Appellee: Captain Christopher Graveline, JA (argued); Lieutenant Colonel Denise R. Lind, JA; Lieutenant Colonel Margaret B. Baines, JA (on brief); Lieutenant Colonel Lauren B. Leeker, JA; Captain Christopher Graveline, JA.

Before CURRIE, JOHNSON, and MOORE, Appellate Military Judges.

## OPINION OF THE COURT

JOHNSON, Judge:[*]

Pursuant to her pleas, appellant was convicted of carrying a concealed weapon, in violation of Article 134, Uniform Code of Military Justice, 10 U.S.C. § 934 [hereinafter UCMJ]. Contrary to her pleas, a general court-martial composed of officer and enlisted members convicted appellant of conspiracy to commit assault consummated by a battery, conspiracy to commit robbery, robbery with a firearm, assault consummated by a battery (two specifications), and engaging in organized criminal activity, in violation of Articles 81, 122, 128, and 134, UCMJ, 10 U.S.C. §§ 881, 922, 928, and 934. The convening authority approved the adjudged sentence to a dishonorable discharge and confinement for twenty-seven years. Appellant was credited with 726 days of confinement against her sentence to confinement.

Appellant was the leader of a chapter of the Gangster Disciples, also known as Growth and Development, a gang that engaged in criminal activity. She exercised complete authority over gang operations in and around Fort Hood and Killeen, Texas; no member was to act on behalf of the gang without her approval. In the early summer of 1997, a local businessman, Mr. Basel Maaz, threw appellant and her gang out of his nightclub, "City Limits." Appellant was offended by Mr. Maaz's treatment of her as she believed City Limits was the Gangster Disciples' "turf." Consequently, she ordered

an assault on Mr. Maaz. On 17 July 1997, four of her gang members executed appellant's order, resulting in the deaths of two of Mr. Maaz's friends and co-workers.[**] Later that summer, appellant led a gang meeting at which fundraising activities, including robbery, were discussed. On 4 August 1997, members of the Gangster Disciples robbed the owner and manager of an apartment complex, taking more than $2,500 cash and a watch worth at least $15,000.

In this Article 66, UCMJ, 10 U.S.C. § 866, appeal, we address four of eleven assigned errors. We conclude that (1) the "protective sweep" of appellant's apartment performed by civilian police officers after her arrest was lawful; (2) appellant's Article 134, UCMJ, conviction for engaging in organized criminal activity as the regional chief of a criminal gang did not violate her First Amendment right of freedom of association; (3) the military judge properly allowed a jeweler to testify as an expert witness for the government; and (4) the evidence proves beyond a reasonable doubt appellant's guilt of robbery and conspiracy to commit robbery.

## PROTECTIVE SWEEP

### Facts

On the morning of 22 April 1998, civilian police officers planned to execute arrest warrants on appellant and three of her cohorts for engaging in organized criminal activities. The police believed that several of the suspects were armed.

Before appellant's arrest, police officers went to the apartment of one of the suspects, Mr. Erik Slaughter, and determined he was not there.

The police then proceeded to appellant's apartment. Upon their arrival, a police officer telephoned appellant. A female, later identified as appellant's roommate, answered. The officer identified himself and asked to speak with appellant. The roommate stated appellant was not in the apartment. Not

---

[*] Judge Johnson took final action before his reassignment.

[**] Appellant was tried for murder and conspiracy to commit murder, but convicted of assault consummated by a battery and conspiracy to commit assault.

believing her, the officer said he knew appellant was in the apartment and instructed her to open the apartment door because he had an arrest warrant for appellant. Shortly thereafter, appellant and her roommate opened the apartment door and came out onto the front porch. Appellant was handcuffed and placed in custody.

The police immediately entered the apartment to determine if any armed individuals were present; they were particularly concerned about Mr. Slaughter. While in the apartment living room, which was adjacent to the porch, an officer noticed a stack of forms. The top form was lying face up. The officer recognized it as a membership application for the Gangster Disciples. The officer asked appellant's roommate for consent to search the apartment. She consented, but told police that she believed she was forced to do so. Upon hearing this, the police secured the apartment and obtained a search warrant. The police were in the apartment for approximately ten to fifteen minutes.

Later that day, a police officer obtained a warrant to search appellant's apartment. The affidavit supporting the warrant discussed the Gangster Disciples membership application forms found in appellant's apartment immediately following her arrest.

Trial defense counsel made a timely motion to suppress all evidence the civilian law enforcement authorities seized from appellant's apartment. The military judge denied the motion. Relying on *Maryland v. Buie*, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990), the military judge held that the police properly conducted a protective sweep of appellant's apartment to clear and secure it after executing a valid arrest warrant for her. As the police officers were lawfully in appellant's apartment and the application forms were in plain view, they could seize the applications. *United States v. Simmonds*, 262 F.3d 468, 470 (5th Cir.2001); *see* Military Rule of Evidence [hereinafter Mil. R. Evid.] 316(d)(4)(C); *United States v. Fogg*, 52 M.J. 144, 149 (C.A.A.F.1999). Further, the police could use this same information to obtain a search warrant.

Appellant argues that the police conducted an illegal search of her apartment and not a protective sweep. She avers that once in custody on the front porch, the police had completed their mission and had no valid reason to enter her apartment. According to appellant, any sweep of the apartment "should have been limited to peeking behind the [apartment's front] door to ensure that no one could leap out" and attack the police. The government counters that the police justifiably entered the apartment to ensure their safety because others named in the arrest warrants were members of appellant's gang, suspected of a double homicide, still at large, and possibly armed and dangerous.

## Discussion

■ The appellate standard for review of a military judge's ruling on a motion to suppress is abuse of discretion. *United States v. Monroe*, 52 M.J. 326, 330 (C.A.A.F.2000); *United States v. Ayala*, 43 M.J. 296, 298 (C.A.A.F.1995). "[W]e review factfinding under the clearly-erroneous standard and conclusions of law under the de novo standard." *Monroe*, 52 M.J. at 330. "In reviewing a ruling on a motion to suppress, we consider the evidence 'in the light most favorable to the' prevailing party." *United States v. Reister*, 44 M.J. 409, 413 (C.A.A.F.1996).

Appellant's argument that the police had no authority to conduct a protective sweep of the apartment once she was in custody and outside the apartment is inconsistent with the rationale of *Buie*. The authority of police to conduct a protective sweep does not turn on whether the person apprehended may harm police, but instead on whether others may be present and pose a danger to the police. *See Buie*, 494 U.S. at 334, 110 S.Ct. 1093.

■ In *Buie*, the Supreme Court held that after an in-home arrest, the police, without probable cause or reasonable suspicion, can "look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Id.; see also Manual for Courts–Martial, United States* (1998 ed.) [hereinafter *MCM*, 1998], app. 22, Mil. R. Evid. 314(g)(3) analysis, at A22–28 (The zone of the search area is the "area immediately adjoining the place of apprehension from which an attack could be

immediately launched."). In the instant case, the police arrested appellant on the small porch outside the front door to her apartment. Less than a minute after appellant's arrest, an officer walked into the living room and saw the forms. As the living room was adjacent to the place of arrest and clearly within the area from which the officers could have been attacked, they lawfully entered it.

The Supreme Court further held in *Buie* that police officers may, after an in-home arrest, conduct a search more pervasive in scope if articulable facts exist "which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Buie*, 494 U.S. at 334, 110 S.Ct. 1093. This sweep may "extend only to a cursory inspection of those spaces where a person may be found," and may last no longer than "is necessary to dispel the reasonable suspicion of danger...." *Id.* at 335, 110 S.Ct. 1093. Such are the facts of this case.

Appellant was arrested for engaging in organized criminal activity. Two other suspects for whom arrest warrants had been issued were still at large. The police reasonably believed that the remaining suspects could be armed and hiding in appellant's apartment. One suspect had been seen previously in possession of weapons. Additionally, other Gangster Disciples members could have been in appellant's apartment. *See United States v. Kimmons*, 965 F.2d 1001, 1009 (11th Cir.1992) (the unknown whereabouts of a robbery co-conspirator justified a protective sweep), *cert. granted and judgment vacated on other grounds, Small v. United States*, 508 U.S. 902, 113 S.Ct. 2326, 124 L.Ed.2d 239 (1993), *judgment reinstated, United States v. Kimmons*, 1 F.3d 1144 (11th Cir.1993). The door to appellant's apartment was open, exposing the officers to danger. Such facts "would warrant a reasonably prudent officer in believing the area harbor[ed] individuals posing a danger to those at the site of the apprehension." Mil. R. Evid. 314(g)(3) analysis, at A22–28. Accordingly, these facts, and the rational inferences drawn

from them, allowed the protective sweep of appellant's apartment.

Furthermore, several federal courts of appeals have held that *Buie's* "articulable facts" test applies to protective sweeps incident to arrests occurring outside the home. *See, e.g., United States v. Colbert*, 76 F.3d 773, 776–77 (6th Cir.1996); *United States v. Biggs*, 70 F.3d 913, 916 (6th Cir.1995); *United States v. Henry*, 48 F.3d 1282, 1284 (D.C.Cir.1995); *Kimmons*, 965 F.2d at 1004, 1009–10; *United States v. Oguns*, 921 F.2d 442, 446–47 (2d Cir.1990); *United States v. Tisdale*, 921 F.2d 1095, 1097 (10th Cir.1990). Likewise, we will not impose a bright-line rule limiting protective sweeps to in-home arrests; it is clear that "in some circumstances, an arrest taking place just outside a home may pose an equally serious threat to the arresting officers." *Colbert*, 76 F.3d at 776. Arresting officers need not wait for a warrant before ensuring their safety and minimizing the risk of an attack if articulable facts support their belief that danger lurks in the home.

In *Oguns*, the Second Circuit upheld a protective sweep of the defendant's apartment that occurred after customs agents apprehended him outside his apartment. 921 F.2d at 447. Oguns was a drug dealer whose source, unknown to him, had been arrested and had agreed to assist the agents. *Id.* at 444. Oguns waited outside the building containing his apartment for a delivery of drugs from his source. *Id.* at 445. After the source arrived, he and Oguns headed towards the apartment. Agents arrested Oguns and conducted a protective sweep of the apartment. The agents had noticed that the door to Oguns' apartment was open. They "could have reasonably believed that others were in the apartment." *Id.* at 446. The agents also reasonably believed that anyone in the apartment could have seen or heard them arrest Oguns, threatened their safety, or destroyed evidence. Given these facts, the court held the sweep satisfied the Fourth Amendment requirements of *Buie*. *Id.*

Similarly, the police officers who arrested appellant outside of her apartment reasonably believed that persons who posed a

threat to their safety could be inside the apartment. Thus, the protective sweep of appellant's apartment was lawful, as was the reading of the application form in plain view.

Regardless, the evidence seized from appellant's apartment inevitably would have been discovered during the subsequent probable cause search of the premises. *See Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984); Mil. R. Evid. 311(b)(2). Once the police officers realized that appellant's roommate would not voluntarily consent to a search of the apartment, the police sealed it and obtained a search warrant from a local magistrate. Even if the affidavit provided to the magistrate had not contained information about the application forms, sufficient information existed to establish probable cause to search appellant's apartment. *See Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978); Mil. R. Evid. 311(g)(2).

Accordingly, the military judge correctly denied appellant's motion to suppress the evidence seized from her apartment.

## APPELLANT'S ROLE AS REGIONAL CHIEF OF A CRIMINAL STREET GANG

■ Appellant stands convicted of violating Article 134, UCMJ, as follows:

Between approximately June 1997 through April 1998, [appellant did] engage in organized criminal activity to wit: the said Specialist Billings acted as the regional chief of a criminal street gang, which said conduct was prejudicial to the good order and discipline of the armed forces and of a nature to bring discredit upon the United States Army.

Appellant now contends that her conviction violates her First Amendment right of freedom of association. We disagree.

The Supreme Court in *Parker v. Levy,* 417 U.S. 733, 758, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974), stated:

While the members of the military are not excluded from the protection granted by the First Amendment, the different character of the military community and of the military mission requires a different application of those protections. The fundamental necessity for obedience, and the consequent necessity for imposition of discipline, may render permissible within the military that which would be constitutionally impermissible outside it.

In *United States v. Zimmerman,* this court stated:

The First Amendment protects citizen[s'] abstract beliefs, as well as their right to join groups and associate with others who hold those same beliefs....

Although members of the armed forces enjoy First Amendment freedoms, the fundamental need for good order and discipline can be compelling enough to warrant the limitation of those freedoms. In other words, First Amendment rights in the armed services are not unlimited and must be brought into balance with the paramount consideration of providing an effective fighting force for the defense of our Country.

43 M.J. 782, 785 (Army Ct.Crim.App.1996) (internal quotations and citations omitted). Accordingly, if one's association with an individual or organization is prejudicial to good order and discipline or service discrediting, then such association may violate Article 134, UCMJ. *See, e.g.,* Army Reg. 600–20, Army Command Policy, para. 4–12*d*(5)*(d)* (30 Mar. 1988) (Soldiers who join extremist groups or engage in extremist group activities may be subjected to "UCMJ action" as violating "Article 134–Conduct which is disorderly or service discrediting."); *cf. United States v. Maderia,* 38 M.J. 494 (C.M.A.1994) (Publicly associating with a person known by accused to be a drug smuggler is conduct unbecoming an officer in violation of Article 133, UCMJ.).

It is well settled that the "First Amendment does not protect violence." *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 916, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982). Association with a group may be punished if there is "clear proof that a defendant 'specifically intend[s] to accomplish [the aims of the organization] by resort[ing] to violence.'" *Scales v. United States,* 367 U.S. 203, 229, 81 S.Ct. 1469, 6 L.Ed.2d 782 (1961) (quoting *Noto v. United States,* 367 U.S. 290, 299, 81 S.Ct. 1517, 6 L.Ed.2d 836 (1961)). In this

case, appellant did not merely associate with a criminal organization; she led it and participated in its members' criminal activities, and by doing so engaged in "organized criminal activity." Despite appellant's claims about the Gangster Disciples' positive qualities, a recognized gang expert testified that the Gangster Disciples had "been identified as a criminal organization." Some of its members brutally murdered two individuals and robbed two others. Appellant conspired with Gangster Disciples members to commit robbery and assault consummated by a battery. Such behavior is not protected in or out of the military.

■ Appellant also claims her conduct was neither prejudicial to good order and discipline or service discrediting. We disagree. Appellant led and recruited active duty soldiers and local civilians, including teenagers, into an organization that settled disputes through murder and assault and raised money through armed robbery. Appellant was not only aware of these activities, she directed some of them. *Cf. United States v. Cyrus*, 46 M.J. 722, 728 (Army Ct.Crim.App. 1997) (appellant not guilty of violating Article 134, UCMJ, because evidence did not establish beyond a reasonable doubt that appellant knew individuals with whom he associated used or distributed drugs). It is beyond dispute that appellant's conduct adversely affected good order and discipline and injured the reputation of the United States Army. Appellant's argument is without merit.

## EXPERT WITNESS

### Facts

■ Three Gangster Disciples and a fourth person committed armed robbery. Among other items, they stole a $15,000 Cartier Tank Francaise watch. The watch was never recovered. To link appellant to the robbery, the government introduced two undated photographs of appellant wearing a watch that appeared similar to the stolen watch. The military judge, over defense objection, allowed Mr. Floyd Pagel, a jeweler in Killeen, Texas, to testify as an expert witness to assist the panel in determining whether appellant's watch shared common character-

istics with Tank Francaise watches. He did not allow Mr. Pagel to testify that appellant's watch was, in fact, a Cartier Tank Francaise watch.

Mr. Pagel testified that although he is primarily self-taught, he has been in the jewelry business for twenty-five years, and deals with "diamonds to colored stones, watches and to anything pertaining to jewelry." He is a member of the National Jewelers Association of Appraisers, whose membership is determined by other jewelers familiar with one's qualifications as a jeweler. He testified that he can distinguish between gold and gold-plated jewelry based on "coloring," and has appraised gold jewelry for insurance companies. He also has attended major jewelry shows at which the foremost watch companies were present.

Mr. Pagel said he is familiar with Cartier watches, and that the Tank Francaise was relatively new. He then described the unique characteristics of Cartier watches, noting that they have a "very white" dial with "Roman numerals, and there's always a jeweled crown of some sort on the watch." He also noted that "the numberings and letterings on the face are usually relatively [sic] the same, even on the different styles of Cartier watches." He further testified that the Tank Francaise's band has a unique hinged link.

During voir dire by defense counsel, Mr. Pagel admitted that he is not an official Cartier watch dealer, that his store does not stock Cartier watches, and that he has never seen "in real life" a Cartier Tank Francaise watch. He also said he is not certified by the Gemological Institute of America, a licensing agency for those who deal in "colored stones and diamonds." The military judge, over defense counsel's objection, recognized Mr. Pagel as an expert in "the field of Cartier watch identification." Appellant asserts the military judge erred. We disagree.

### Discussion

Our superior court recently said:

Admission of opinion testimony by an expert in a court-martial is governed by Mil. R.Evid. 702, which requires qualification of the expert "by knowledge, skill, experi-

ence, training, or education." In *Daubert* [*v. Merrell Dow Pharmaceuticals, Inc.*], the Supreme Court held that a trial judge is required to make a preliminary assessment of whether the reasoning or methodology underlying the expert's testimony is scientifically sound, and whether that reasoning or methodology properly applies to the facts at issue. 509 U.S. [579,] 592–93, 113 S.Ct. 2786[, 125 L.Ed.2d 469] [1993]. Subsequently, in *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the Supreme Court held that *Daubert* applies not only to expert testimony based upon "scientific" knowledge, but also to "technical" and "other specialized" knowledge covered by Fed.R.Evid 702. *Id.* at 146, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238. The Court noted that the trial judge has a "gatekeeping function" in these inquires to "ensure that any and all ... [expert] testimony ... is not only relevant, but reliable." *Id.* at 147, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238.

*United States v. Quintanilla*, 56 M.J. 37, 84–85 (C.A.A.F.2001); *see United States v. Norris*, 55 M.J. 209, 212 (C.A.A.F.2001); *United States v. Houser*, 36 M.J. 392, 397 (C.M.A. 1993).

"The standard of our review of the military judge's ruling admitting [expert] testimony is abuse of discretion." *United States v. Norris*, 55 M.J. at 212 (citing *General Electric Co. v. Joiner*, 522 U.S. 136, 143, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997); *United States v. Houser*, 36 M.J. at 397). We will not set aside a military judge's decision to admit evidence unless we form a "definite and firm conviction that the court below committed a clear error of judgment." *Houser*, 36 M.J. at 397 (citations omitted).

Mr. Pagel's testimony focused on matters clearly within his expertise. First, he testified, based on his many years of experience, about how gold and gold plate differ in appearance. He then concluded that the body of the watch appellant wore in the two photographs appeared to be real gold rather than gold plate. Second, while using a ten-power loupe to examine the photographs of appellant wearing the watch, he noted features of the watch that were characteristic of Cartier watches:

> The pattern of the links, the jeweled crown, the dial as visible with a very white dial that a Cartier has, the black hands, and the black numbers that go along with the Cartier watch. You know, the link patterns are the same, the way ... which can be seen by anybody with this compared to that, as far as the way that the links cross-over and come back up, and the way that they taper. But the dial is white with the black Roman numeral and the black hands.

Third, he noted that the pattern of the links in appellant's watch band would be difficult to copy. Lastly, he said he had never seen a replica or copy of a Cartier watch made of solid gold.

Mr. Pagel's testimony was based upon "personal knowledge [and] experience." *Kumho Tire*, 526 U.S. at 150, 119 S.Ct. 1167. It was relevant, reliable, and probative. *Norris*, 55 M.J. at 212; *Houser*, 36 M.J. at 397. Thus, we hold that the military judge did not abuse his discretion qualifying Mr. Pagel as an expert and admitting his testimony.

## SUFFICIENCY OF THE EVIDENCE TO SUPPORT THE ROBBERY AND CONSPIRACY TO COMMIT ROBBERY

■ Appellant alleges that the evidence is insufficient to support her conviction for robbery and conspiracy to commit robbery. We disagree.

### Standard of Review

"Article 66(c)[,UCMJ,] requires the Courts of Criminal Appeals to conduct a *de novo* review of legal and factual sufficiency of the case." *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F.2002) (citation omitted). We "may affirm a conviction only if [we] conclude[ ], as a matter of factual sufficiency, that the evidence proves appellant's guilt beyond a reasonable doubt." *Id.* (citations omitted). We must review the entire record, to "include[ ] the evidence presented by the parties and the findings of guilt. Such a review involves a fresh, impartial look at the evidence, giving no deference to the decision

of the trial court on factual sufficiency beyond the admonition in Article 66(c), UCMJ, to take into account the fact that the trial court saw and heard the witnesses." *Id.; see United States v. Sills*, 56 M.J. 239, 240–41 (C.A.A.F.2002); *United States v. Reed*, 54 M.J. 37, 41 (C.A.A.F.2000); *United States v. Turner*, 25 M.J. 324, 325 (C.M.A.1987).

### Facts

On 4 August 1997, Mr. Kenneth Green, PVT Devon Chisom (also known as Psycho), Mr. Ed Magee (also known as BMG or Big Money Grip), and "Nate" entered the Monaghan Apartments Rental Office and robbed its occupants. Only Mr. Green was not a Gangster Disciple. The robbery was executed according to a plan devised by Mr. Erik Slaughter. The robbers' faces were covered; two robbers carried pistols. They took approximately $1900 in rental receipts and petty cash, $500 from the manager, and a Tank Francaise Cartier gold watch valued at approximately $15,000 from the apartment complex owner. The watch was never recovered. All four individuals eventually were apprehended, two within minutes of the robbery.

Proof of appellant's complicity in the conspiracy and robbery was based, in part, on the fact that she was the Gangster Disciples' leader in the Fort Hood area and that no one in the gang could act without her approval. Appellant herself emphasized this fact in a letter she wrote to the members of her Region: "I'm the head of the family and no one there is above me so you all can either do as I say or remove yourself from my Region and you know like I do it's not that easy."

Mr. Kenneth Green testified that the day before the robbery, he met appellant and several other Gangster Disciples at Mr. Slaughter's apartment. As Mr. Green left, Mr. Slaughter approached him and asked if he was busy the next day. When Mr. Green said that he was not busy, Mr. Slaughter told him that he would need him for "something the next day." Later, Mr. Magee asked Mr. Green if he knew about the robbery planned for the next day. Mr. Green said that he did not. Mr. Magee then told Mr. Green "what was supposed to happen."

The next day, Mr. Green called appellant and told her that he could not take part in the robbery because he "had some family problems and had to watch [his] little girl." Appellant said, "Well, okay, I'll tell Erik." Mr. Green had not mentioned Mr. Slaughter's name. Mr. Green's impression was that appellant knew about the robbery.

Later that day, however, PVT Chisom and Mr. Magee accompanied Mr. Green to Mr. Slaughter's apartment. Immediately before the robbery, Mr. Slaughter gave Mr. Green, PVT Chisom, Mr. Magee, and Nate their instructions and then "issued out the guns." After the robbery, Mr. Green and Nate returned to Mr. Slaughter's apartment.

On cross-examination, Mr. Green admitted that he had been convicted of forgery, that Gangster Disciples members had written statements against him, and that in return for his testimony the government agreed to reduce the charge against him from aggravated robbery to robbery and to put a letter in his file that would allow for early parole.

Private Chisom testified that he attended a fundraising meeting led by appellant. Several ideas for raising money for the gang were discussed. When Mr. Slaughter suggested robbery as an option to raise funds, appellant reacted with silence. Private Chisom "took that as being 'Okay.' "

Sergeant Stasch, a twenty-year veteran of the Chicago Police Department and gang expert with specific knowledge of the Gangster Disciples, testified about the gang's hierarchical structure. A governor is the senior leader responsible for a geographic region and answers to a Board of Directors and the Chairman of the Board. A "soldier," the lowest ranking Gangster Disciple, "would not have any authority to commit individual acts under the guise of the organization without authority from above." The governor or one of his or her subordinate leaders is the approval authority, depending on the size of the chapter. If a group within the Gangster Disciples committed an armed robbery and "took a trophy like a $15,000 watch," it would be "passed up to the highest ranking member of that organization." Testimony from both government and defense witnesses clearly established that appellant was the

governor of the region that included Fort Hood.

As discussed *supra*, Mr. Pagel opined that the watch appellant wore in two photographs was most likely gold, that counterfeit watches usually are not made of gold, that the watch bore the characteristics of a Cartier watch, and that it would be difficult to copy the links in the band of a Tank Francaise Cartier. On cross examination, he said it is a "possibility" that fake Tank Francaise Cartier watches exist. He also said that most of his work "regarding identifying watches and identifying jewelry comes from actually holding the jewelry and looking at it and telling if it's real," not by examining photographs.

### Discussion

"The formation of a conspiracy need not take any particular form or be manifested in any formal words. The agreement can be silent, ... tacit[,] or [only a] mutual understanding between the parties. It is usually manifested by the conduct of the parties themselves." *United States v. Whitten*, 56 M.J. 234, 236 (C.A.A.F.2002) (internal quotations and citations omitted). Circumstantial evidence can be used to establish the existence of the agreement. *United States v. Williams–Hendricks*, 805 F.2d 496, 502 (5th Cir.1986). An agreement between the conspirators may be silent and need not be spoken. *Id.* The evidence must establish that two or more people in some way or manner reached a mutual understanding to try to accomplish an unlawful act. *Id.* If one is a party to a conspiracy, he or she is liable for all offenses committed by any of the co-conspirators while the conspiracy continues. *MCM*, 1998, Part IV, para. 5c(5). Mere presence and association, however, with conspirators is insufficient to support a conspiracy conviction. *See United States v. Knowles*, 66 F.3d 1146, 1157 (11th Cir.1995).

Here we have more than mere presence. Appellant led the meeting at which Mr. Slaughter suggested robbery as a means to raise funds for the gang. As the approval authority for such conduct, appellant silently concurred. Appellant knew Mr. Slaughter planned the robbery, when it would occur, and how to contact him about changes to the plan. She had authority to excuse an individual from participating in the robbery. According to practice and tradition, proceeds from the robbery would directly benefit appellant. She was photographed wearing a gold watch similar to the stolen watch. The evidence is consistent, leaving no fair and reasonable hypothesis other than appellant's guilt. *United States v. Harville*, 14 M.J. 270, 271 (C.M.A.1982). Accordingly, we are convinced beyond a reasonable doubt of appellant's guilt of conspiracy to commit robbery and robbery. *See* UCMJ art. 66(c); *Washington*, 57 M.J. 394.

We have considered appellant's other assignments of error and the matters asserted under *United States v. Grostefon*, 12 M.J. 431 (C.M.A.1982), and find them to be without merit.

The findings of guilty and the sentence are affirmed.

Senior Judge CURRIE and Judge MOORE concur.