UNITED STATES, Appellee,

v.

Herbert L. BRINSON, Airman Basic,
U.S. Air Force, Appellant.

No. 97–1008.
Crim.App. No. S29228.

U.S. Court of Appeals for
the Armed Forces.

Argued June 4, 1998.

Decided Sept. 30, 1998.

For Appellant: *Captain Thomas R. Uiselt* (argued); *Colonel Douglas H. Kohrt* and *Major Kevin P. Koehler* (on brief).

For Appellee: *Major J. Robert Cantrall* (argued); *Colonel Brenda J. Hollis, Lieutenant Colonel Michael J. Breslin,* and *Major Allen G. Erickson* (on brief).

*Opinion of the Court*

SULLIVAN, Judge:

In February 1996, appellant was tried by a special court-martial composed of officer and enlisted members at Spangdahlem Air Base, Germany. Contrary to his pleas, he was found guilty of assault upon a security police officer (2 specifications), communicating a threat (2 specifications), communicating indecent language, and failure to go to his appointed place of duty, in violation of Articles 128, 134, and 86, Uniform Code of Military Justice, 10 USC §§ 928, 934, and 886, respectively. He was sentenced to a bad-conduct discharge (BCD), confinement for 90 days, and forfeiture of $583.00 pay per month for 3 months. On May 13, 1996, the convening authority approved this sentence. On May 12, 1997, the Court of Criminal Appeals affirmed the findings of guilty and the approved sentence.

On November 6, 1997, this Court granted review of the following issue:

WHETHER THE EVIDENCE FAILS TO SUPPORT THE CONVICTION FOR INDECENT LANGUAGE, WHERE THE LANGUAGE ALLEGED AND PROVEN IS NOT "INDECENT" UNDER THE LAW.

When the Government makes speech a crime, the judges on appeal must use an exacting ruler. Therefore, we hold that the evidence in the record is not legally sufficient to support appellant's conviction for communicating indecent language. *See United States v. French,* 31 MJ 57, 60 (CMA 1990)(particular-circumstances test); *see also United States v. Adams,* 49 MJ 182 (1998). Nevertheless, we also hold that this evidence is legally sufficient to sustain a finding that appellant's words constituted disorderly conduct under Article 134. *See United States v. Choate,* 32 MJ 423, 427 (CMA 1991).

The evidence of record in this case shows the following. At approximately 0312 hours on November 26, 1995, Technical Sergeant (TSGT) Thomas Cleveland, a law enforcement specialist as well as a certified emergency medical technician (EMT), received an emergency call from a pregnant female complaining of severe abdominal pain. TSGT Cleveland responded to the third floor of Dorm 225. TSGT Cleveland had also requested the presence of a female security police officer, Senior Airman (SrA) Shannon Landow, to assist him.

While on the scene, TSGT Cleveland gathered some necessary medical information from the pregnant female. He relayed this information to the medics. Then TSGT Cleveland stepped out of the woman's room with another soldier who attempted to use a cellular telephone.

TSGT Cleveland testified that he then "saw a black female coming backwards" at the end of the hallway "as if she had been shoved," and "then she lunged . back." He also "heard a lot of yelling and screaming." The noise that TSGT Cleveland heard was a disagreement between appellant and his fiancée, Airman (AMN) Braley. Appellant and AMN Braley had just returned from the NCO Club and were having an argument over appellant's relationship with another woman.

TSGT Cleveland testified that when he and SrA Landow approached the corner at which appellant and AMN Braley were located, he

observed appellant and AMN Braley "grabbing ..., struggling, yelling and screaming and swearing at each other." TSGT Cleveland also testified that he then identified himself and "instructed" appellant and AMN Braley "to separate." Both appellant and AMN Braley, however, testified that they were not involved in a physical altercation at the time TSGT Cleveland approached them. Moreover, appellant testified that TSGT Cleveland did not initially identify himself.

According to TSGT Cleveland, he next asked appellant for his identification card but appellant refused to provide it; appellant. stated that he did not need to show his "fucking ID card." Furthermore, TSGT Cleveland testified that AMN Braley then approached him and asked why they were "getting involved" in appellant's and AMN Braley's "business." TSGT Cleveland "told" AMN Braley "to step back around" the corner with SrA Landow. He then requested appellant's identification card again. Appellant's alleged response was that the sergeant "was a white mother fucker" and that he "was always treating black people like niggers."

After another request for appellant's identification card, appellant allegedly responded "fuck off." TSGT Cleveland then told appellant that he would apprehend him for assault and being "drunk and disorderly" if he did not provide identification. TSGT Cleveland testified that appellant stated "that he was going to kick my fucking white ass."

Next, appellant allegedly "drew his right hand back in a closed fist" position and went towards TSGT Cleveland. TSGT Cleveland then used a Personal Apprehension Restraint Technique to apply one handcuff on appellant. When TSGT Cleveland attempted to put the right handcuff on appellant, AMN Braley approached him and grabbed his right arm and chest area. Appellant then "struck" TSGT Cleveland "in the right jaw with his elbow, snapping" TSGT Cleveland's head and "almost knocking" him "off balance." AMN Braley, however, testified that when she approached TSGT Cleveland and appellant, TSGT Cleveland "pushed" her "back." AMN Braley stated that she then

was merely attempting "to cover" appellant's mouth in order to "calm him."

TSGT Cleveland testified that next he applied the right handcuff to appellant and "pushed" appellant "into the wall and told him to stay there" because SrA Landow "was having trouble restraining the female." AMN Braley was "struggling and fighting" with SrA Landow and "grabbing her in the abdomen and in the pubic area, and trying to pinch her and fight her and kick at her. She was also calling Landow a bitch and calling [TSGT Cleveland] a mother fucker."

TSGT Cleveland also provided the following testimony:

*As I was taking him down the steps, he was telling me that I was a mother fucker, a son of a bitch. If he could get the handcuffs off, he'd kick my ass.* I got him out to the parking lot. *I told him to lean over the hood of the car, and he told me to fuck off and that he was going to kick my white fucking ass.* I applied pressure, and I made him—forced him onto the hood of the car.

(Emphasis added.)

TSGT Cleveland testified further that when he and SrA Landow were escorting AMN Braley down the steps, he witnessed appellant kick Airman First Class (A1C) Smith "in the right kneecap area with his left foot." TSGT Cleveland then "ran over to help" A1C Smith and, as he did, appellant "struck" TSGT Cleveland "just below the left kneecap with an outward motion with his right foot."

TSGT Cleveland then recounted the following:

While we were cuffing [appellant] was telling me that he was—if he could get out of the irons, that he was going to kick my fucking ass. Then later he was telling me that it was cold, to take the leg shackles off; that he would walk to the car. Then in the very next breath while he was struggling against the shackles, that he was going to kick my ass.

\* \* \*

[Appellant] ... looked up at Sergeant Crosby. As I was opening the car doors

before they picked him up, he told Sergeant Crosby that if he could get the handcuffs and leg shackles off of him that he would kick his ass.

\* \* \*

[Appellant] told Sergeant DeVries not to point his weapon at him; and Sergeant DeVries explained to him that his weapon was slung barrel down and that his weapon wasn't pointing at him, his barrel was on the ground. He was looking at Sergeant DeVries and Sergeant Crosby and calling them mother fuckers and son of a bitches.

\* \* \*

We put him in the patrol car. Airman Landow and Airman Kriger, after they got the shoes for the female, they retrieved Airman Brinson's ID card and the young lady's ID card and transported them to the Law Enforcement Desk.

Appellant testified on his own behalf. In general, he stated that he either did not remember using "profanity" or making threats, or that he did not in fact say the things other witnesses had alleged. Appellant admitted, however, that "depend[ing] on the circumstances" he would use profanity and that he did use "some profanity" the night of the arrest. Moreover, appellant stated that he called TSGT Cleveland something to the effect of a "white fucking," that he told TSGT Cleveland to "[g]et me the fuck off the ground. It's cold. Take these fucking chains off of me. I'm going to walk to the fucking car," and that he told Staff Sergeant Crosby that he would "kick his ass."

— —— —

■ Appellant was found guilty of communicating indecent language as follows:

In that [appellant] did, at Spangdahlem Air Base, Germany, on or about 26 November 1995, orally communicate to Technical Sergeant Thomas Cleveland, certain indecent language, to wit: "fuck you, you white mother fucker"; "get me the fuck off the ground; it's cold; take these fucking chains off of me, I'm going to walk to the fucking car"; "white mother fuckers"; and

"you can't treat me like niggers," or words to that effect.

The record contains ample evidence that appellant uttered these words while being arrested. The pertinent question in this case, however, is whether the shouting of such epithets at a law enforcement official by an arrestee during his arrest constitutes indecent language as a matter of criminal law in the military. *See also United States v. Adams, supra* (whether certain words said to arresting officer constituted provoking speech).

The crime of communicating indecent language is not particularly delineated in the Uniform Code of Military Justice. Article 134, however, provides:

Though not specifically mentioned in this chapter, *all disorders and neglects to the prejudice of good order and discipline in the armed forces, all conduct of a nature to bring discredit upon the armed forces,* and crimes and offenses not capital, of which persons subject to this chapter may be guilty, *shall be taken cognizance of by a general, special or summary court-martial, according to the nature and degree of the offense,* and shall be punished at the discretion of that court.

(Emphasis added.)

The President in the Manual for Courts–Martial identifies the use of indecent language as such a disorder in violation of Article 134. He denotes its elements as follows:

(1) That the accused orally or in writing communicated to another person certain language;

(2) That such language was indecent; and

(3) That, under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces.

Para. 89b, Part IV, Manual for Courts–Martial, United States (1995 ed.). His explanation of this offense further provides:

"Indecent" language is that which is grossly offensive to modesty, decency, or propriety, or shocks the moral sense, because of

its vulgar, filthy, or disgusting nature, or its tendency to incite lustful thought. *Language is indecent if it tends reasonably to corrupt morals or incite libidinous thoughts.* The language must violate community standards.

Para. 89c (emphasis added).

■ This authority, however, does not stand alone in explaining what indecent language is for purposes of Article 134. In this regard, we note that we have previously had occasion to consider the meaning of "indecent" as a matter of criminal law. In *United States v. French,* 31 MJ 57 (1990), we evaluated the sufficiency of a specification alleging indecent language. There, the accused had asked his 15–year–old stepdaughter "if he could climb into bed with her." At trial, he "argued that the language pleaded was not indecent *per se.*" *Id.* at 58. We rejected that argument and instead reaffirmed our own test to determine if language is indecent for purposes of this military criminal offense. That test is "whether the particular language is *calculated* to corrupt morals or excite libidinous thoughts." *Id.* at 60 (emphasis added), quoting *United States v. Linyear,* 3 MJ 1027, 1030 (NCMR 1977), *pet. denied,* 5 MJ 269 (1978); *see also United States v. Hullett,* 40 MJ 189, 194 (CMA 1994)(Sullivan, C.J., and Crawford, J., dissenting).

■ "Calculate[d]" is generally understood to mean "intend[ed]" or "plan[ned]" to bring about a certain result. *See Webster's Ninth New Collegiate Dictionary* 196 (1991). A determination whether language was intended to corrupt morals or excite libidinous thoughts cannot be made in isolation from the other evidence in the record. Instead, we must examine the entire record of trial to determine the precise circumstances under which the charged language was communicated. *Cf. Adams,* 49 MJ at 185 (a provoking-words case observing that "all the circumstances surrounding use of the words should be considered"). As stated by Justice Holmes in *Schenck v. United States,* 249 U.S. 47, 52, 39 S.Ct. 247, 249, 63 L.Ed. 470 (1919), "[T]he character of every act depends upon the circumstances in which it is done."

In the instant case, the following circumstances existed when appellant uttered the charged epithets. First, he had been previously involved in an emotional argument with his fiancée concerning his relationship with another woman. Second, appellant was forcefully prevented by TSGT Cleveland from resolving his differences with his fiancée. Third, appellant resisted TSGT Cleveland in a manner which escalated into a physical altercation. Fourth, appellant was handcuffed by TSGT Cleveland against his will and by force.

In addition, we note that appellant's fiancée was "struggling and fighting" with another law enforcement official only a short distance away from him. Moreover, appellant was escorted down the stairs and forced onto the hood of a patrol car, after becoming physically involved with yet another law enforcement official. Finally, appellant was "take[n] down" to the ground and placed in leg shackles connected to the handcuffs on his wrists. In these circumstances, appellant's use of coarse language was clearly calculated or intended to express his rage, not any sexual desire or moral dissolution. *See also United States v. Guerrero,* 33 MJ 295, 298 (CMA 1991)(noting significance of circumstances in which conduct occurred for purposes of determining whether a service disorder occurred), *cert. denied,* 502 U.S. 1096, 112 S.Ct. 1173, 117 L.Ed.2d 418 (1992).

■ Nevertheless, neither criminal law, as applied in the military through the UCMJ, nor this Court will condone appellant's scurrilous public denunciation of this law enforcement officer. We conclude that his conviction for the lesser-included offense of disorderly conduct is not only authorized but required. *See* Arts. 59(b) and 79, UCMJ, 10 USC §§ 859(b) and 879, respectively.

■ More particularly, appellant was charged with using indecent language in circumstances where it was prejudicial to good order and discipline in the armed forces or of a nature to bring discredit upon the armed forces, in violation of Article 134. *See* para. 89, Part IV. Such a charge necessarily includes an allegation of a simple military disorder. *See Choate,* 32 MJ at 427 (indecent-

exposure charge broad enough to include simple military-disorder offense); *see generally* para. 73c(2) ("Disorderly conduct ... includes conduct that endangers public morals or outrages public decency and any disturbance of a contentious or turbulent character."). Moreover, this Court has held that even if there is a failure of proof of one of the required elements of a crime, an appellate court may still affirm a finding of guilty to a lesser-included offense which is supported by the evidence. *See generally United States v. Patterson,* 14 USCMA 441, 444, 34 CMR 221, 224 (1964). Accordingly, although the evidence in this case was insufficient to show the language was indecent, we still conclude that it was sufficient to establish the offense of disorderly conduct. *See United States v. Choate, supra.*

█ Finally, our holding today does not require a sentence reduction on appellant's behalf. He was sentenced for numerous other offenses, including two assaults on security police officers and two specifications of communicating a threat. The modification of this relatively minor offense could not reasonably be considered outcome-determinative. In any event, the military judge ruled that the charges of communicating indecent language and communicating a threat were multiplicious for sentencing and that they should be treated as one offense for purposes of sentencing. Finally, the sentence that appellant received as a result of his outrageous course of conduct was well below the maximum authorized punishment for these various offenses, whether at a special court-martial (BCD and confinement for 6 months) or a general court-martial (dishonorable discharge, 6–7 years confinement). Art. 19, UCMJ, 10 USC § 819; *see* paras. 54e(6) and 109(e), Part IV, Manual, *supra.* Furthermore, reduction of the adjudged sentence in this context would seem improbable. Accordingly, appellant was not prejudiced as to sentence by the above error.

## DECISION

The specification of Charge III is amended to read as follows:

In that [appellant] <u>was</u>, at or near Spangdahlem Air Base, Germany, on or about 26 November 1995, <u>disorderly by</u> orally communicating to Technical Sergeant Thomas Cleveland, <u>certain language,</u> to wit: "fuck you, you white mother fucker"; "get me the fuck off the ground; it's cold; take these fucking chains off of me; I'm going to walk to the fucking car"; "white mother fuckers"; and "you can't treat me like niggers," or words to that effect, <u>which conduct was to the prejudice of good order and discipline in the armed forces.</u>

(Underlined language added or revised.)

The decision of the United States Air Force Court of Criminal Appeals is affirmed as to Charge III and its specification as amended, as well as to the remaining Charges and their specifications and the sentence.

Judge EFFRON concurs.

COX, Chief Judge (concurring):

I concur in the opinion of my colleague, Judge Sullivan. I write separately to answer some of the questions raised by Judge Crawford. First, it cannot be gainsaid that the language used on the night in question was gross, vulgar, and profane. Neither can it be denied that such outrageous reaction and disrespect to the security police performing their legitimate duties were, under the circumstances present here, punishable under the Uniform Code of Military Justice.

The question presented, however, is more narrow and academic. It is not whether gross, vulgar profanity can be punished under the Uniform Code, but whether it can be punished as "indecent language," as defined in paragraph 89c, Part IV, Manual for Courts–Martial, United States (1995 ed.). Judge Crawford does not concern herself with the evolution of Article 134,[1] but rather reacts viscerally to this unseemly profanity. Even though her opinion is facially attractive, it is nevertheless flawed.

---

1. Uniform Code of Military Justice, 10 USC § 934.

Historically, Article 53 of The American Articles of War of 1874 provided that "[a]ny officer who uses any profane oath or execration shall, for each offense, forfeit and pay one dollar. Any soldier who so offends shall incur the penalties provided in the preceding article" ("one-sixth of a dollar").

Colonel Winthrop informs us that, in Colonial times, this was considered a serious offense. However by 1886, the date of his famous work, profane language was treated as a disrespect or disorder under the 62d Article; and Article 53 had become virtually "obsolete." *Military Law and Precedents* 657 (2d ed. 1920 Reprint).

In more modern times, the Manual for Courts–Martial, United States, 1951, at 492, contained a sample specification (# 148) for communicating indecent, insulting, or obscene language to a female (under Article 134); and a maximum punishment was listed in the Table of Maximum Punishments, *id.* at 226. However, no substantive description of the offense was provided.

In contrast, the offense of indecent assault (also under Article 134) was described in the 1951 Manual (para. 213d(2)); and a punishment level was specified for "the taking by a man of indecent, lewd, or lascivious liberties with the person of a female, without her consent and against her will, *with intent to gratify his lust or sexual desires.*" *Id.* at 386 (emphasis added). The offense of indecent acts with a child under the age of 16 years was similarly described. Para. 213d(3).

The situation was unchanged in the Manual for Courts–Martial, United States, 1969 (Revised edition), except that a variant sample specification (# 158) was provided for communicating indecent, insulting, or obscene language to a child under the age of 16, with enhanced penalties listed in the Table.

The Manual for Courts–Martial, United States, 1984, contains the present format. Of course, the statutory elements are those of Article 134, namely:

(1) That the accused did or failed to do certain acts; and

(2) That, under the circumstances, the accused's conduct was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces.

Para. 60b, Part IV, 1984 Manual, *supra* (1995 ed.).

Pursuant to his authority to establish sentence ceilings for such various misconduct, *see* Art. 56, UCMJ, 10 USC·§ 856; *United States v. Bivins,* 49 MJ 328 (Sept. 30, 1998); *United States v. Beckett,* 49 MJ 354 (Sept. 30, 1998), the President has established a separate maximum punishment for misconduct meeting the following criteria:

(1) That the accused orally or in writing communicated to another person certain language;

(2) That such language was *indecent;* and

(3) That, under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces.

Para. 89b, Part IV, 1984 Manual, *supra* (1995 ed.) (emphasis added). ·

The $64 question is, what is the nature of this linguistic indecency the President references in paragraph 89? Paragraph 89c now describes " '[i]ndecent' language" as

that which is grossly offensive to modesty, decency, or propriety, or shocks the moral sense, because of its vulgar, filthy, or disgusting nature, or its tendency to incite lustful thought. *Language is indecent if it tends reasonably to corrupt morals or incite libidinous thoughts.* The language must violate community standards.

(Emphasis added.)

The 1984 Manual's analysis section, at A21–102, notes that paragraph 89c

is new and is based on *United States v. Knowles,* 15 U.S.C.M.A. 404, 35 C.M.R. 376 (1965); *United States v. Wainwright,* 42 C.M.R. 997 (A.F.C.M.R.1970). For a general discussion of this offense, *see United States v. Linyear,* [3 M.J. 1027 (N.C.M.R.1977) ].

*Knowles* dealt with a portion of paragraph 213d(3), the predecessor of paragraph 89c, not here pertinent. In *Wainwright,* the question was whether language which was

not indecent *per se* could be indecent in context. The Air Force Court of Military Review concluded that it could, stating:

> The necessary attribute of indecency or obscenity can, therefore, be said to be adequately alleged if the language employed by the accused, when reasonably construed by community standards, *serves to convey a libidinous message,* whether or not the words themselves are impure.

42 CMR at 999–1000 (emphasis added). Further, the court opined:

> We are not prepared to conclude, however, that *expressions otherwise barren of libidinous innuendo,* when given their ordinary meaning, can be infused with criminality by the simple expedient of alleging them to be indecent.

*Id.* at 1000 (emphasis added).

*Linyear* involved a charge that the accused communicated "insulting"[2] language to a female by calling her "swine." The Court of Military Review observed:

> The true test of verbal obscenity is whether the particular language is *calculated to corrupt morals or excite libidinous thoughts.*

3 MJ at 1030 (emphasis added). The court concluded:

> The words [alleged uttered by the accused] neither expressly nor by fair implication constitute an indecent communication as they *cannot reasonably be construed to convey a libidinous message.*

*Id.* at 1030 (emphasis added).

These, then, are the cases upon which the drafters of the Manual say paragraph 89c was based; and paragraph 89c purports to indicate the content of "indecent."

We have never held that profanity is *per se* indecent under paragraph 89 or that words such as those uttered by appellant were indecent. From our common experience, we note that scarcely a day would pass without numerous violations of the Uniform Code if servicemembers were prosecuted for using the well-known "four letter words." Sadly,

the lexicon of many servicemembers is replete with such profanity.

Indeed, we have observed that streams of epithets, such as "mother f——," "kiss my a—," and the like, are common expressions not uttered with any intent to excite libidinous thoughts. In two cases that we have found, the service courts, following the practice suggested by Colonel Winthrop, have treated profanity as either provoking words or as simple disorders, unless the words were intended to carry "a libidinous message." *United States v. Prince,* 14 MJ 654, 656 (ACMR 1982); *United States v. Jackson,* 12 CMR 403 (ABR), *pet. denied,* 13 CMR 142 (1953).

As Judge Foreman wrote in *Prince:*

> Coarse language among soldiers, male or female, does not *per se* constitute a violation of Article 134. Of course, under some circumstances not present in this case, coarse or disrespectful language directed toward another soldier may constitute provoking language in violation of Article 117 if the language is of the type which tends to induce a breach of the peace, or it may constitute a simple disorder under Article 134 when the language is directed toward a service member who, although not an officer or noncommissioned officer, nevertheless is in the execution of a position of authority.

14 MJ at 656.

It is quite clear that Congress deemed certain language unlawful when it constituted a danger to good order and discipline. Thus, Article 88 proscribes contempt against certain officials of the Government; Article 89 prohibits disrespect toward superior officers; Article 91 prohibits contemptuous and disrespectful language toward warrant officers, noncommissioned officers, and petty officers while in the execution of office; Article 107 prohibits false official statements; Article 116 prohibits riots and breaches of the peace;

---

**2.** The 1984 Manual dropped both "insulting" and "obscene" from the description of the of-

fense. Drafters' Analysis, 1984 Manual, *supra* at A21–102; *see* A23–18 (1995 ed.).

and finally, Article 117 prohibits provoking speeches or gestures.[3]

Additionally, over the years, other forms of speech, which under the particular facts and circumstances constituted conduct prejudicial to good order and discipline or were service discrediting, have been prosecuted under the general article (Art. 134) or, in the case of commissioned officers, as conduct unbecoming an officer (Art. 133, UCMJ, 10 USC § 933). Indecent language and communication of a threat are additional examples. *See* paras. 89 and 110, Part IV Manual, *supra* (1995 ed.).

It is black letter law that conduct which can be prosecuted under one of the enumerated articles—Articles 80 through 132—cannot be prosecuted under the general article. Para. 60c(5)(a), Part IV, Manual, *supra* (1995 ed.). Likewise, language which constitutes conduct in violation of Article 134 should not be made the basis of an unreasonable multiplication of charges against an accused. *See generally Ball v. United States,* 470 U.S. 856, 861, 105 S.Ct. 1668, 84 L.Ed.2d 740 (1985); *United States v. Foster,* 40 MJ 140, 144 n. 4 (CMA 1994); *United States v. Teters,* 37 MJ 370 (CMA 1993).

The bottom line is that, historically, the crime of "indecent language" has been limited to those circumstances wherein the speech was intended to convey a "libidinous message." I recognize that the most recent description of the offense in paragraph 89c, if read in the disjunctive, seems broad enough to support Judge Crawford's view that the

definition of "indecent language" was vastly expanded in 1984. However, the language must be read in the context of the drafters' analysis—which continues to evince a limitation of "indecent language" to speech tending to "corrupt morals or excite libidinous thoughts." *Linyear, supra* at 1030.

There are a variety of ways to punish a servicemember who publicly utters gross, vulgar language to a police officer in the execution of a lawful arrest. We need not expand the well-established definition of "indecent" to accommodate a conviction here. Accordingly, I join Judge Sullivan's opinion.

CRAWFORD, Judge, with whom GIERKE, Judge, joins (dissenting in part and concurring in the result):

Paragraph 89c, Part IV, Manual for Courts-Martial, United States (1995 ed.), *provides at least two* definitions of "indecent language," either of which can be the basis for a conviction. In addition to the language underscored by the majority, 49 MJ at 363–64, the Manual also provides that indecent language includes language that "is grossly offensive to modesty, decency, or propriety, or shocks the moral sense, because of its vulgar, filthy, or disgusting nature, or its tendency to incite lustful thought." *Id.* Appellant's words fit within this definition. His language was "grossly offensive" to "propriety" and was "vulgar, filthy, [and] disgusting."

For this reason, I concur in the result concerning the sentence and dissent from the majority holding that reduces the finding of indecent language to the lesser-included offense of disorderly conduct.

---

3. UCMJ, 10 USC §§ 888, 889, 891, 907, 916, 917, respectively.