CORRECTED COPY

# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
BURTON, HAGLER, and SCHASBERGER
Appellate Military Judges

**UNITED STATES, Appellee**
**v.**
**Captain RICHARD M. CAMACHO**
**United States Army, Appellant**

ARMY 20140495

Headquarters, 82d Airborne Division
Deidra J. Fleming, Military Judge
Colonel John N. Ohlweiler, Staff Judge Advocate

For Appellant:  Captain Daniel C. Kim, JA; John N. Maher, Esquire (on brief);
Captain Steven J. Dray, JA; John N. Maher, Esquire (on reply brief).

For Appellee:  Lieutenant Colonel Eric K. Stafford, JA; Major Austin L. Fenwick,
JA; Captain Joshua Banister, JA (on brief).

30 November 2018

---------------------------------
MEMORANDUM OPINION
---------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

BURTON, Senior Judge:

In this case, we explore a mélange of unlawful command influence claims, encompassed in appellant's first two assignments of error.  These claims involve statements by politicians and senior leaders concerning sexual assault in the armed forces, the Sexual Harassment/Assault Response and Prevention (SHARP) program, and a meeting by the convening authority and the victim in the case after referral of charges.  We find, under the facts of this case, that neither unlawful command influence nor unlawful influence tainted these proceedings.  We also address appellant's assertion that the evidence is legally and factually insufficient to support

the findings of guilty in the case; on this issue we provide appellant some relief by dismissing the kidnapping and indecent language specifications.[1]

---

[1] After due consideration, we find the remaining seven assignments of error lack merit.

One of these assigned errors claims appellant's trial defense counsel were ineffective in failing to show the members a videotaped interview of the victim, Captain (CPT) AA, by the Army Criminal Investigation Command (CID). During this approximately ninety-minute interview, CPT AA stated "there was no sexual force, or anything." Appellant also asserts counsel were deficient in failing to request or obtain the metadata for the photographs of CPT AA's injuries admitted at trial or use that information to verify the timeline of events reported by CPT AA.

"In order to prevail on a claim of ineffective assistance of counsel, an appellant must demonstrate both (1) that his counsel's performance was deficient, and (2) that this deficiency resulted in prejudice." *United States v. Green*, 68 M.J. 360, 361-62 (C.A.A.F. 2010) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). "When challenging the performance of counsel, the defense bears the burden of establishing the truth of the factual allegations that would provide the basis for finding deficient performance." *United States v. Tippit*, 65 M.J. 69, 76 (C.A.A.F. 2007); (citing *United States v. Polk*, 32 M.J. 150, 153 (C.M.A. 1991)).

Appellant's claims are not supported by any evidence in the record of trial (*see* Rule for Court-Martial (R.C.M.) 1103(b)(2)(D)), or properly admitted on the appellate record. The recording of the CID interview was neither marked nor admitted at trial or during the post-trial Article 39a, UCMJ, session. A ten-second excerpt was contained in the appellant's R.C.M. 1105 matters, but that is not the record before us on review. Likewise, the metadata for the photographs was not marked or admitted on the record. Finally, appellant's claims are not supported by affidavits or sworn statements. Without evidence before us in a manner we can consider, we are left with appellant's naked assertions of trial defense counsel's deficiencies. In a claim of ineffective assistance of counsel, the burden lays solely on appellant to prove the claim. When the claim relies entirely on evidence not included as part of the authenticated record, failure to meet the burden may be fatal. We therefore find appellant has not met his burden in establishing deficient performance by his trial defense counsel.

Even if we were to consider the excerpt of the CID interview in appellant's R.C.M. 1105 submission, we would still reject appellant's ineffective assistance of counsel claim. Simply put, this short clip extracted from the interview is not contextualized in relation to the entire interview. Appellant has not shown how this clip, in context, would have resulted in a different outcome at trial.

A panel of officers sitting as a general court-martial, convicted appellant contrary to his pleas, of one specification of aggravated sexual contact and one specification of abusive sexual contact, seven specifications of assault, one specification of kidnapping, and one specification of indecent language in violation of Articles 120, 128, and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 920, 928, 934 (2012) [UCMJ]. The panel acquitted appellant of one specification of aggravated sexual contact, two specifications of aggravated assault, one specification of simple assault, and three specifications of communicating a threat, charged under Articles 120, 128 and 134, UCMJ. The panel sentenced appellant to a dismissal, confinement for two years, and forfeiture of all pay and allowances. The convening authority approved the sentence as adjudged.

## BACKGROUND

Appellant and CPT AA started dating while they were cadets at the United States Military Academy (USMA). They married after both graduated from flight school in 2009.

In 2011, CPT AA informed appellant that she wanted a divorce. Appellant opposed dissolution of their marriage. Later in the year, CPT AA and appellant both deployed to Afghanistan, but to different forward operating bases (FOB). While deployed, CPT AA engaged in an extra marital affair with a noncommissioned officer (NCO).

Upon redeployment in September 2012, CPT AA continued to push for a divorce. On or about 8 November 2012, during a verbal disagreement at their residence, appellant threw a set of keys, hitting CPT AA in the back. Captain AA called her friend CPT YD. When CPT YD arrived at the residence, CPT AA was outside waiting for her. On the drive to work, CPT AA told CPT YD about the incident involving the keys. Once they arrived at work, CPT YD suggested that they take photographs of CPT AA's back to document the injury and so that CPT AA could see the injury to her back. This incident was not reported to law enforcement or the military chain of command, as CPT AA did not want to negatively impact appellant's career.

On 18 November 2012, CPT AA again told appellant she wanted a divorce.

On 19 November 2012, the NCO's wife reported the extramarital affair to the NCO's chain of command. After receiving a text from the NCO, CPT AA told appellant about the affair while they were having lunch at a local restaurant. Appellant stormed out of the restaurant, got in his car, threw CPT AA's purse out of the window, and began to drive out of the parking lot. Appellant then backed up and told CPT AA to get into the car. As they drove back to Fort Bragg, appellant was

3

visibly angry and drove erratically. He called a friend, JS,[2] and requested that he accompany them to the trial defense service (TDS) office.

When they arrived at Fort Bragg, appellant picked up JS. As they drove to TDS, CPT AA was crying and appellant was very upset. At TDS, JS told appellant he should remain in the car because appellant was still very upset, loud, and verbally abusive. Captain AA went in to meet with an attorney. When she was done, they all returned to drop JS off at the company area. Before leaving the car, JS told appellant and CPT AA they should not be together that night.

Appellant and CPT AA proceeded to their residence. Once there, appellant became even more agitated, throwing CPT AA's belongings from the car. He initially refused to let CPT AA into the residence, but then pulled her inside. Once inside, he demanded that CPT AA write down all of her passwords for her computer, bank accounts, and emails. Appellant also took CPT AA's phone.

Appellant called CPT YD on speaker phone and demanded she come over to pick up a gift that had been purchased for her son. Captain YD and her husband, CPT DD, came over about two hours later. They witnessed appellant screaming at CPT AA. They testified that appellant referred to CPT AA as "a filthy whore, a cunt, a slut," "a fucking whore," and "a fucking bitch." Captain YD attempted to calm appellant down. When CPT YD's attempts failed, she tried to get CPT AA to leave with her. Captain AA shook her head no and stated, "No, I can't leave," "I can't go," and "I don't want to go." Appellant responded by informing CPTs YD and DD that they were trespassing and needed to get out of his house.

After CPT YD and DD left the residence, appellant's rage continued to grow. At different times that night, appellant struck CPT AA with his hands on various parts of her body, to include her legs, thighs, buttocks, torso, ribs, chest, eye, and head. At some point, he threw an ottoman and a pillow at her, touched her buttocks and genitalia against her will, and forced her to touch his penis. Appellant told CPT AA that if she left, he would harm himself.

Throughout the night CPT YD called CPT AA numerous times. Eventually appellant answered the phone and stated, "stop fucking calling." Appellant did allow CPT YD to speak to CPT AA via speaker phone, and CPT AA stated that she was okay.

When appellant woke up the next morning, he resumed hitting CPT AA.

Upon arriving to her unit later that morning, CPT AA told CPT YD about the events of the previous evening and that morning. Captain YD photographed CPT

---

[2] JS was previously CPT JS. He knew both appellant and CPT AA from USMA.

AA's numerous injuries. Against CPT AA's wishes, CPTs YD and DD reported these injuries to the chain of command and a protective order was implemented.

A commander's inquiry relating to adultery and fraternization had already been initiated in reference to CPT AA and the NCO.[3]

## LAW AND DISCUSSION

### A. Unlawful Command Influence

Appellant's UCI claims fall broadly into two categories. First, appellant avers Army officials, fearful of the perception of being weak on sexual assault, deprived appellant of protections guaranteed by the Fifth and Sixth Amendments to the U.S. Constitution. Second, appellant asserts the Army's application of the SHARP program in appellant's case constituted UCI. This includes a general assertion that the convening authority's favorable disposition of an adverse action against the victim, CPT AA, was proof of UCI. In these broad claims, appellant largely reasserts the same UCI arguments litigated in three motions at various stages at the trial level.

We review allegations of unlawful command influence de novo. *United States v. Salyer*, 72 M.J. 415, 423 (C.A.A.F. 2013) (citations omitted).

### 1. Motions at the Trial Level

We review the military judge's findings of fact made in ruling on a UCI motion under a clearly erroneous standard. *United States v. Villareal*, 52 M.J. 27, 30 (C.A.A.F. 1999). Where a "military judge made detailed findings of fact . . . and these findings are clearly supported by the record," we adopt them in our analysis. *Id.* With that said, we briefly examine the three UCI motions and rulings at trial.

### a. Political Leaders, Senior Military Officials, and DoD Policy

During an Article 39a, UCMJ, session on 3 April 2014, appellant claimed statements in the media by the President, Members of Congress, and senior Army leadership concerning sexual assault in the military, combined with the Department of Defense (DoD) SHARP policy and training, constituted apparent UCI and tainted the accusatory stage of the proceedings. In support of the allegations, defense counsel introduced statements by various senior leaders and politicians about sexual

---

[3] Captain AA ultimately received a locally-filed General Officer Memorandum of Reprimand (GOMOR) and a negative officer evaluation report for this inappropriate relationship.

assault in the military. The defense also introduced slides from various SHARP training presentations. Defense counsel averred that these statements put pressure on the battalion commander, Lieutenant Colonel (LTC) BC, to recommend proceeding to a court-martial on charges preferred after a year-long investigation.

During the pretrial motion, LTC BC testified that he did not feel any pressure from his superiors to take a particular action in appellant's case, nor did he believe that there was a climate that all sexual assaults had to be charged. No further evidence was presented.[4]

After considering the evidence presented, to include LTC BC's testimony, the military judge found defense counsel failed to present evidence showing that actual or apparent UCI impacted the proceedings. Specific to her finding, the military judge found LTC BC, in acting on the charges, did not receive pressure from his superiors to take a particular action in this case. Noting defense counsel had conceded no actual UCI in the case, the military judge concluded there was no evidence that publicity concerning sexual assault in the military or sexual assault training impacted the "preferral, pretrial investigation, or referral" in the case. Specifically, the military judge found defense had failed to demonstrate a logical connection or nexus between this publicity and appellant's case in terms of potential to cause unfairness. The military judge further concluded the actions of LTC BC in directing additional investigations into the case and, later, recommending the case proceed to trial, were not the product of actual or apparent UCI, but rather the "permissible actions of a Battalion Commander exercising his authority to appoint a commander's inquiry and to recommend trial by court-martial."

### b. Claims of a Former Chief of Justice

During an Article 39a, UCMJ, session on 6 June 2013, appellant raised a supplemental motion to dismiss for UCI, this time asserting that the Deputy Staff Judge Advocate (DSJA) commanded subordinates to recommend preferral of charges for all allegations of sexual assault, thus preventing the Chief of Military Justice (COJ), Brigade Judge Advocate and Trial Counsel from making independent and informed appraisals and recommendations to the commanders of the 82d Combat

---

[4] Though not raised by the appellant, we note that appellant did voir dire the panel members about their exposure to SHARP training as well as comments from senior leaders and politicians. None of the panel members felt pressure to find appellant guilty. One panel member was challenged by appellant and excused on an unrelated matter.

Aviation Brigade. In support of this allegation Major Erik Burris,[5] the former COJ testified that he was told by the Staff Judge Advocate (SJA) and the DSJA that if there is probable cause in a sexual assault case, then charges must be preferred. Major Burris further testified that he felt pressure to charge sexual assault cases and that he informed his subordinates of this requirement to prefer all allegations of sexual assault.

In response to MAJ Burris, the government called the then current COJ, CPT RL, who testified that he was a senior trial counsel when MAJ Burris was the COJ. He attended most meetings with MAJ Burris and MAJ Burris never informed him of any policy or guidance on the disposition of sexual assault cases. According to CPT RL, neither the SJA nor the DSJA provided such guidance to him. Similarly, CPT RL never informed his subordinate trial counsel of such a policy. More importantly, CPT RL stated that he did not feel any pressure to pursue sexual assault cases and that the trial counsel assigned to appellant's case were not assigned to the office when MAJ Burris was the COJ.

In denying this motion, the military judge noted, "Based on the Court's ability to observe these two witnesses, the Court found CPT [RL's] testimony credible as opposed to MAJ Burris' testimony." The military judge found MAJ Burris, in his testimony, did not "remember exactly how he shared the [DSJA's] guidance, to whom he shared the guidance, at what location he shared the guidance, and when he shared the guidance." Even accepting everything MAJ Burris stated at face value, the military judge concluded trial defense counsel failed to produce some evidence of actual UCI and that apparent UCI did not affect the proceedings.

---

[5] At the time of appellant's court-martial, MAJ Burris had been relieved of his duties as the COJ and was pending court-martial for charges similar to those faced by appellant. Major Burris was subsequently convicted of disobeying a superior commissioned officer as well as rape, sodomy, and assault consummated by battery of his wife. His case is pending appellate review. *See United States v. Burris*, ARMY 20150047, 2017 CCA LEXIS 315 (Army Ct. Crim. App. 8 May 2017), *reconsidered* 2017 CCA LEXIS 507 (Army Ct. Crim. App. 28 Jul. 2017); *vacated and remanded*, 78 M.J. 56 (C.A.A.F. 2018). We did not consider any matters from the case of *U.S. v. Burris* in deciding appellant's case.

### c. The Convening Authority met with Captain AA

After the trial adjourned, appellant hired a civilian attorney to represent him in the post-trial stages.[6] On 3 April 2015, appellant's civilian defense counsel requested a post-trial article Article 39(a), UCMJ, session to address several issues, to include UCI. The military judge ruled that a post-trial hearing would be held to address the appellant's allegations that possible UCI occurred through email exchanges, various oral communications, or in-person meetings between the SJA, CPT AA, CPT AA's civilian attorney (Mr. TC), the Special Victim's Counsel (SVC), and the Commanding General, who was also the convening authority in appellant's case.[7] Appellant asserted, among other things, that preferential treatment afforded by the convening authority to CPT AA in addressing her misconduct was yet more proof of UCI.

In four Article 39a, UCMJ, sessions held over seven months from October 2015 to May 2016, the military judge examined evidence submitted by the parties and heard from ten witnesses, to include the convening authority.[8]

During his testimony, the convening authority was not asked about his decision to refer the charges in appellant's case; instead he was asked about his decision to locally file a General Officer Memorandum of Reprimand (GOMOR) CPT AA received for her inappropriate relationship with the male NCO. The convening authority's response to a congressional inquiry filed by appellant was submitted for the post-trial Article 39a, UCMJ, session, which stated, "Regarding CPT Camacho's concern that UCI played a role in this case, I can assure you that I considered only the facts of the case when I made my decision to refer it to a General Court-Martial."

The military judge also considered evidence that between 8 November 2013 through on or about 14 April 2014, Mr. TC began email communication with the SJA, DSJA, TC, SVC, and Special Victim Prosecutor (SVP). These emails included disparaging remarks about appellant and comments such as "I do see some concerns reprimanding a domestic violence victim." In their testimony, the SJA and DSJA

---

[6] Appellant released his counsel who had represented him during the trial on the merits. The civilian counsel, Mr. Maher, also represents appellant before this court.

[7] Appellant also filed a motion to dismiss, or in the alternative, for a new trial. This request was properly denied by the military judge.

[8] We applaud the military judge for conducting these post-trial sessions in order to address potential issues before the case was forwarded to this court. Not only does this practice serve the interests of judicial economy, it allows the military judge most familiar with the case to address the issues.

acknowledged receipt of the emails from Mr. TC, but both denied ever discussing or showing the emails to the convening authority.

Based on the evidence and testimony, the military judge made several factual findings. First, the military judge found the charges were preferred against appellant on 6 November 2013. Second, on 11 February 2014, the convening authority referred the charges in appellant's case to a general court-martial based on the Article 32, UCMJ, investigation and the Investigating Officer's recommendation. Third, on 31 March 2014, the following people met with the convening authority: the SJA, CPT AA, Mr. TC, the SVC, and COL MM (all of these individuals, except CPT AA, testified at the post-trial Article 39a, UCMJ, session).[9] The purpose of this meeting was to discuss the filing of the GOMOR that CPT AA received on 6 November 2013 for adultery and fraternization. There was no discussion during this meeting concerning appellant's case.

The military judge considered all of the testimony and found defense counsel had failed to establish a logical connection between appellant's various claims of UCI based upon CPT AA's meeting with the convening authority and the alleged preferential treatment received by CPT AA from the convening authority and others in addressing her fraternization and adultery with the male NCO. Specifically, the military judge found no linkage between Mr. TC's correspondence with the SJA and the convening authority's decision to refer charges against appellant to trial.

We find the military judge's findings of fact in each of these motions were not clearly erroneous and we agree with the military judge's resolution in each instance.

### 2. *Appellant's Claims on Appeal*

Before us, appellant makes several arguments as to why UCI pervaded this case. We need not address many of these allegations as we find the military judge correctly decided these UCI claims each time they were raised. Nonetheless, some of appellant's arguments warrant a brief discussion, but no relief.

---

[9] Defense counsel were not notified about this meeting until after the trial adjourned. In the post-trial Article 39a, UCMJ, session, appellant asserted the government's failure to notify defense of this meeting and provide related correspondence between CPT AA's attorney and the government constituted a violation of Rule for Court-Martial 701(a)(6) and *Brady v. Maryland*, 373 U.S. 83 (1963). The military judge– correctly, in our view–determined that even if the government's failure to provide this information violated R.C.M. 701(a)(6) or *Brady*, the defense failed to establish reasonable probability that there would have been a different result at trial. *See Kyles v. Whitley*, 514 U.S. 419 (1995).

*a. Unlawful Command Influence*

As an overall claim, appellant asserts CPT AA was vested with a special victim status that, in various ways, unfairly tilted the proceedings against appellant. This status allowed CPT AA to change duty stations to Fort Leonard Wood, where she was awarded a slot in the Engineer Captain's Career Course (ECCC), and effectively allowed her to escape punishment. Appellant asserts the application of the SHARP program to CPT AA constituted UCI and prejudiced his trial. We disagree.

Article 37(a), UCMJ, states in relevant part: "No person subject to this chapter may attempt to coerce or . . . influence the action of a court-martial or any other military tribunal or any member thereof, in reaching the findings or sentence in any case . . . ." "Even if there was no actual unlawful command influence, there may be a question whether the influence of command placed an intolerable strain on public perception of the military justice system." *United States v. Lewis*, 63 M.J. 405, 415 (C.A.A.F. 2006) (quoting *United States v. Stoneman*, 57 M.J. 35, 42-43 (C.A.A.F. 2002)) (internal quotation marks omitted). "[T]he appearance of unlawful command influence will exist where an objective, disinterested observer, fully informed of all the facts and circumstances, would harbor a significant doubt about the fairness of the proceeding." *Lewis*, 63 M.J. at 415.

On appeal, appellant bears the initial burden of raising unlawful command influence. "Appellant must show: (1) facts, which if true, constitute unlawful command influence; (2) that the proceedings were unfair; and (3) that the unlawful command influence was the cause of the unfairness." *Salyer*, 72 M.J. at 423 (citing *United States v. Richter*, 51 M.J. 213, 224 (C.A.A.F. 1999)) (quoting *United States v. Biagase*, 50 M.J. 143, 150 (C.A.A.F. 1999)). "Thus, the initial burden of showing potential unlawful command influence is low, but is more than mere allegation or speculation." *Id.* (citing *Stoneman*, 57 M.J. at 41). "The quantum of evidence required to raise unlawful command influence is "'some evidence.'" *Id.* (citing *Stoneman*, 57 M.J. at 41) (quoting *Biagase*, 50 M.J. at 150). Our superior court has further held that "prejudice is not presumed until the defense produces evidence of proximate causation between the acts constituting [UCI] and the outcome of the court-martial." *Biagase*, 50 M.J. at 150 (citing *United States v. Reynolds*, 40 M.J. 198, 202 (C.M.A. 1994)).

Once an appellant has presented some evidence of UCI, the burden shifts to the government to demonstrate to this court beyond a reasonable doubt that: "(1) the predicate facts do not exist; (2) the facts do not constitute unlawful command influence; or (3) the unlawful command influence did not affect the findings or sentence." *Salyer,* 72 M.J. at 423 (citing *Biagase*, 50 M.J. at 151).

Simply because the Army has a SHARP program and instituted training does not constitute UCI. Appellant fails to demonstrate any nexus between the SHARP program, generally, and the any issue of consequence that occurred in his trial. Further, no evidence was presented, in particular, to show that anyone in a position of authority over appellant's case was influenced by the Army's SHARP program, training they may have attended, or comments made by senior leaders and/or politicians. There must be more than command influence "in the air" to justify action by an appellate court. *United States v. Allen*, 33 M.J. 209, 212 (C.M.A. 1991) (citations omitted). Appellant's claims, taken in totality, do not pass this measure, particularly given that the evidence and testimony presented during the three UCI motion hearings compellingly demonstrated that the commanders who recommended action or took action in appellant's case were not improperly influenced in making their decisions.

Overall, we find appellant has failed to present "some evidence" of actual or apparent unlawful command influence on appellant's proceedings. Even if we had found appellant met this initial low burden of proof, we are convinced beyond a reasonable doubt that no unlawful command influence affected the findings or sentence.

### b. *Unlawful Influence*

As another overarching theme, appellant claims the convening authority's meeting with CPT AA and Mr. TC on 31 March 2014, and the lack of any meaningful punishment for CPT AA for fraternization and adultery, somehow injected unlawful command influence into appellant's trial. Although we view this not as a UCI claim, but rather an unlawful influence claim, we still resolve this issue against appellant.

We are mindful that, while most claims under Article 37(a), UCMJ, allege the unlawful influence was committed by someone wearing the mantle of command authority, that is not a prerequisite to establishing a claim that the proceedings were unlawfully influenced by a member subject to the UCMJ. Both unlawful command influence and unlawful influence are proscribed by Article 37, UCMJ, but the latter does not require the act be done with the mantle of command authority. Actual unlawful influence occurs "when there is an improper manipulation of the criminal justice process which negatively affects the fair handling and/or disposition of a case." *United States v. Barry*, 78 M.J. 70, 77 (C.A.A.F. 2018) (quoting *United States v. Boyce*, 76 M.J. 242, 247 (C.A.A.F. 2017). The test for unlawful influence is the same as the test for unlawful command influence, including the requirement, if appellant meets his burden, that the government prove any improper influence was harmless beyond a reasonable doubt. *Barry*, 78 M.J. at 77 n.4.

11

First, appellant tries to reason that CPT AA's lack of meaningful punishment for fraternization and adultery are proof of the unlawful influence pervading his trial. Again, we see no nexus between the resolution of CPT AA's GOMOR, her move to Fort Leonard Wood, or attendance at the ECCC and the results of appellant's trial. As explained by the convening authority, CPT AA's GOMOR was locally-filed because the issuance of a negative Officer Evaluation Report would have the same detrimental effect on her career. CPT AA's permanent change of station was something permitted by DoD policy, which also had no nexus to the charges against appellant. Finally, CPT AA's attendance at ECCC was authorized by a completely different command, not the convening authority.

Second, we find no evidence of unlawful influence exerted by Mr. TC or CPT AA simply because they requested and were granted a routine meeting with the convening authority to discuss a GOMOR filing determination. Appellant's court-martial was not a topic raised during the meeting. While the record is replete with messages and comments by Mr. TC to members of the SJA's staff that disparaged appellant, none of these communications were shared with the convening authority. Finally, and more importantly, this meeting occurred well after the convening authority referred charges. Unlawful influence did not occur, nor was there an appearance of unlawful influence, in the referral stage of appellant's trial. A meeting between the convening authority and CPT AA to discuss the filing of a GOMOR did not create actual or apparent unlawful influence in decisions previously made by the convening authority.

Overall, as with UCI, we find appellant has failed to present "some evidence" of actual or apparent unlawful influence on appellant's proceedings. Even if we had found appellant met this initial low burden of proof, we are again convinced beyond a reasonable doubt that any of the alleged unlawful influence did not affect the findings or sentence.

*B. Factual and Legal Sufficiency*

Article 66(c), UCMJ, establishes our statutory duty to review a record of trial for legal and factual sufficiency de novo. *United States v. Walters*, 58 M.J. 391, 395 (C.A.A.F. 2003). Under Article 66(c), UCMJ, we may affirm only such findings of guilty that we find correct in law and fact and determine, based on the entire record, should be affirmed. In weighing factual sufficiency, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt." *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). "[A]fter weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we must be] convinced of the [appellant's] guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). The evidence must leave "no fair and reasonable hypothesis other than

appellant's guilt." *United States v. Billings*, 58 M.J. 861, 869 (Army Ct. Crim. App. 2003) (citation omitted).

### 1. Kidnapping

As charged in Specification 1 of Charge III, the Article 134, UCMJ offense of kidnapping required, *inter alia*, proof beyond a reasonable doubt that appellant held CPT AA against her will. *See Manual for Courts-Martial, United States* (2012 ed.) [MCM], pt. IV, ¶ 92.b.(2). We find the evidence insufficient on this element.

There is no dispute that appellant and CPT AA were in their marital home on 19 November 2012. However, we cannot find beyond a reasonable doubt that appellant held CPT AA against her will. In making this determination we considered that an involuntary detention "may result from force, mental or physical coercion, or from other means, including false representations." *MCM*, pt. IV, ¶ 92.c.(3).. We find none of these modes of detention here. In making this assessment, we have also factored in the "availability or nonavailablity" to CPT AA of a means of exit or escape and evidence of threats or force (or lack thereof). *See id.* We conclude that CPT AA had at least three opportunities to leave; twice when CPT YD and DD requested she leave; and then when appellant was asleep or unconscious. Additionally, CPT AA was not in a remote location where help could not be obtained. Instead she was in her marital home in a neighborhood where she knew several of her neighbors, to include her closest neighbor whom she met at USMA. The only threat appellant made was to injure himself, which under the unique circumstances of this case, was not sufficient to prove appellant held CPT AA against her will. Therefore, we find the evidence factually insufficient for the offense of kidnapping.

### 2. Indecent Language

We also find the evidence supporting appellant's conviction for indecent language factually insufficient.

A conviction for the delivery of indecent language can be upheld when the language used is "grossly offensive to modesty, decency, or propriety, or shocks the moral sense because of its vulgar, filthy, or disgusting nature, or its tendency to incite lustful thought." *MCM*, pt. IV, ¶ 89.c.; *see also United States v. Green*, 68 M.J. 266, 269 (C.A.A.F. 2010); *United States v. Negron*, 60 M.J. 136, 142 (C.A.A.F. 2004). In a nutshell, the Manual presents two separate definitions by which to measure speech that, depending on the "context in which it is spoken" may be a crime. *Negron*, 60 M.J. at 144; *see also United States v. Jackson*, NMCCA 20090041, 2009 CCA LEXIS 298, at *7-*8 (N.M. Ct. Crim. App. 25 Aug. 2009).

The opprobrium appellant spewed at his unfaithful spouse "was clearly calculated or intended to express his rage, not any sexual desire." *United States v. Brinson*, 49 M.J. 360, 364 (C.A.A.F. 1998). Put another way, there was clearly no "libidinous message" conveyed. *Id.* at 368 (Cox, C.J., concurring).

Examining the words used by the cuckolded appellant to describe his wife, *in context*, we do not find them to meet the definition of "indecent language," nor to be service discrediting or prejudicial to good order and discipline. Appellant's abusive language was directed at a fellow captain (his wife) at an off-post private residence shortly after discovering CPT AA had an adulterous affair with a noncommissioned officer while both she and appellant were deployed. The victim of appellant's tirade was neither a minor, *see, e.g., United States v. Avery*, ARMY 20140202, 2017 CCA LEXIS 739 (Army Ct. Crim. App. 30 Nov. 2017) (unpub.), nor a subordinate, *see, e.g., United States v. Caver*, 41 M.J. 556 (N.M. Ct. Crim. App. 1994). The presence of two other officers of equal rank during appellant's profanity-laced tirade is of no moment here. In a different setting, it can not[10] be gainsaid that appellant's outrageous description of a fellow human being would be so grossly offensive to decency as to meet all elements of the offense of indecent language. However, under the facts of this case, we are unable to affirm appellant's conviction and accordingly set aside and dismiss Specification 5 of Charge III as factually insufficient.

## CONCLUSION

The findings of guilty for Specifications 1 and 5 of Charge III are set aside and dismissed. The remaining findings of guilty are AFFIRMED.

We are able to reassess the sentence on the basis of the errors noted and do so after conducting a thorough analysis of the totality of circumstances presented by appellant's case and in accordance with the principles articulated by our superior court in *United States v. Sales*, 22 M.J. 305 (C.M.A. 1986), and *United States v. Winckelmann*, 73 M.J. 11, 15-16 (C.A.A.F. 2013).

In evaluating the *Winckelmann* factors, we first find a significant change in the penalty landscape, as the maximum period of confinement dropped from life without the possibility of parole to twenty-nine years and six months. However, this one factor is not dispositive. *Id.* at 15. Second, we note that appellant elected to be tried by members, a factor which can weigh against a sentence reassessment. However, "this factor could become more relevant where charges address service custom, service discrediting conduct, or conduct unbecoming." *Id.* at 16. The remaining charges, in our view, truly capture the gravamen of appellant's offenses. That is, the charges in this case primarily focused on appellant's brutal assaults,

---

[10] Corrected

14

aggravated sexual contact, and abusive sexual contact with his wife. We have extensive experience and familiarity with these types of offenses as they are the subject of many of the cases we review, and can reliably determine that appellant would have received a dismissal, confinement for two years and forfeiture of all pay and allowances even without the dismissed specifications. We therefore AFFIRM the sentence as adjudged.

All rights, privileges, and property, of which appellant has been deprived by virtue of those portions of the findings set aside by our decision, are ordered restored.

Judge HAGLER and Judge SCHASBERGER concur.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court